ACCEPTED
03-15-00329-CV
5698503
THIRD COURT OF APPEALS
AUSTIN, TEXAS
6/16/2015 3:10:31 PM
JEFFREY D. KYLE
CLERK

No. 03-15-00329-CV

# In The Court of Appeals For the Third District of Texas at Austin

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
6/16/2015 3:10:31 PM
JEFFREY D. KYLE
Clerk

GREGORY G. GRAZE AND CYNTHIA A. CRIDDLE, on behalf of themselves and all others similarly situated,

Appellants,

v.

NATIONSTAR MORTGAGE, LLC,

Appellee.

On Appeal from the 261st District, Travis County, Texas
MDL Pretrial Court No. D-1-GN-14-005248
Dallas County Originating Case No. DC-13-05406
MDL No. 13-0427

## BRIEF OF APPELLANTS

J. Patrick Sutton
Texas Bar No. 24058143
1706 W. 10th Street
Austin Texas 78703
Tel. (512) 417-5903
Fax. (512) 355-4155
*jpatricksutton@*
*jpatricksuttonlaw.com*

Jeffrey W. Hurt, Esq.
Texas Bar No. 10317055
10670 N. Central Expy Ste 450
Dallas, Texas 75231
Tel: (214) 382-5656
Fax: (214) 382-5657
*jwhurt@hurtberry.com*

Counsel for Appellants

ORAL ARGUMENT REQUESTED                June 16, 2015

# IDENTITY OF PARTIES AND COUNSEL

**Appellants:**          Gregory G. Graze, an individual
Cynthia A. Criddle, an individual

**Appellee:**          Nationstar Mortgage, LLC, a Delaware limited liability company with headquarters in Texas

**Counsel for Appellants:**

J. Patrick Sutton
SBOT 24058143
1706 W. 10th Street
Austin Texas 78703
Tel. (512) 417-5903
Fax (512) 355-4155
*jpatricksutton@jpatricksuttonlaw.com*

**Counsel for Appellees:**

Thomas G. Yoxall
Daron Janis
Locke Lord LLP
2200 Ross Avenue Suite 2200
Dallas TX 75201
*tyoxall@lockelord.com*
*djanis@lockelord.com*

B. David L. Foster
Locke Lord LLP
600 Congress Avenue, Suite 2200
Austin, Texas 78701
*dfoster@lockelord.com*

**MDL Pretrial Court:**      261st District Court of Travis County, Texas, Hon. Lora J. Livingston

# TABLE OF CONTENTS

INDEX OF AUTHORITIES .......................................................................iii

ORAL ARGUMENT IS REQUESTED ..................................................... 1

STATEMENT OF THE CASE ................................................................. 2

ISSUES PRESENTED .............................................................................3

INTRODUCTION ................................................................................... 4

STATEMENT OF FACTS ........................................................................ 7

SUMMARY OF ARGUMENT................................................................. 12

ARGUMENT.......................................................................................... 16

    I.  Standard of Review...................................................................... 16

    II. Section 50(a)(6)(L) prohibits payment shocks even if -- *especially if* -- a borrower agrees to them............................................................ 17

        A. Section 50(a)(6) has both one-time requirements and perpetual requirements ............................................................... 18

        B. Section 50(a)(6)(L) prevents payment shocks in multiple ways 21

    III. The trial court erred in concluding that Nationstar cured the violations of Section 50(a)(6)(L) ........................................................... 28

PRAYER FOR RELIEF .......................................................................... 31

CERTIFICATE OF SERVICE ............................................................... 32

CERTIFICATE OF COMPLIANCE ....................................................... 33

APPELLANTS' APPENDIX.................................................................... 34

# INDEX OF AUTHORITIES

**Cases**

*Bally Total Fitness Corp. v. Jackson*, 53 S.W.3d 352 (Tex. 2001)..12

*Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195 (Tex. 1995).............17

*Cerda v. 2004-EQR1 L.L.C.*, 612 F.3d 781 (5th Cir. 2010)........22, 24

*Doody v. Ameriquest Mortg. Co.*, 49 S.W.3d 342 (Tex. 2001)..........17

*Double Diamond, Inc. v. Saturn*, 339 S.W.3d 337 (Tex. App.-
   Dallas 2011, rev. denied) ...............................................................31

*Fin. Comm'n of Texas v. Norwood*, 418 S.W.3d 566 (Tex. 2013,
   reh'g denied) ...................................................................................18

*Garrett Operators, Inc. v. City of Houston*, No. 01-13-00767-CV,
   2015 WL 293305 (Tex. App. - Houston [1st Dist.] 2015) ..............17

*Ins. Co. of N. Am. v. Sec. Ins. Co.*, 790 S.W.2d 407 (Tex. App. --
   Houston [1st Dist.] 1990, no writ)................................................17

*Sims v. Carrington Mortgage Servs., L.L.C.*, 440 S.W.3d 10 (Tex.
   2014, reh'g denied) ............................................................12, 14, 18

*Valence Operating Co. v. Dorsett,* 164 S.W.3d 656 (Tex. 2005) ......16

**Statutes and Rules**

7 Tex. Admin. Code § 153.1(1) (2015) ................................9, 21, 25, 28

7 Tex. Admin. Code § 153.11 (2008) ............................................22, 23

7 Tex. Admin. Code § 153.14(2)(C) (2008)..................................20, 28

7 Tex. Admin. Code § 153.16 (2004) ............................................22, 23

T.R.A.P. 43.3 ....................................................................................31

Tex. R. Civ. P. 166a(c) .....................................................................16

Tex. R. Civ. P. 42(c)(3).....................................................................12

**Other Authorities**

Ann Graham, *Where Agencies, the Courts, and the Legislature Collide: Ten Years of Interpreting the Texas Constitutional Provisions for Home Equity Lending*, 9 Tex. Tech Admin. L.J. 69, 84 (2007) ............................................................. 21

Eliz. Olson, *Paying Off the Mortgage Is Becoming Harder for Older Workers*, NYT, June 12, 2015 ......................................... 13, 21

**Constitutional Provisions**

Section 50(a)(6)(B) ................................................................. 18

Section 50(a)(6)(C) ................................................................. 20

Section 50(a)(6)(D) ............................................................ 19, 20

Section 50(a)(6)(F) ................................................................. 20

Section 50(a)(6)(G) ................................................................. 20

Section 50(a)(6)(J) .................................................................. 19

Section 50(a)(6)(K) ................................................................. 19

Section 50(a)(6)(L) ........................................................... *passim*

Section 50(a)(6)(M) ................................................................ 19

Section 50(a)(6)(N) ................................................................. 19

Section 50(a)(6)(Q)(i)-(ix) ....................................................... 19

Section 50(a)(6)(Q)(x) ......................................................... 11, 31

Section 50(a)(6)(Q)(x)(c) ...................................................... 10, 29

Section 50(a)(6)(Q)(x)(f) ...................................................... 10, 29

Section 50(a)(6)(u) ................................................................. 21

Tex. Const. art. XVI, § 50(a)(6) ........................................... *passim*

## ORAL ARGUMENT IS REQUESTED

In the case of home equity loans, the Texas Constitution bars repayment schedules that are not "substantially equal." Yet hundreds or thousands of Texas home equity borrowers in the proposed class now stand to lose their homesteads unexpectedly, years or decades from now, when large payment shocks come due. Oral argument is warranted on the novel and important issue whether the parties to a home equity loan can agree, after origination and for any reason whatsoever, to abandon the "substantially equal" payments in the original note in favor of volatile payment schedules.

# STATEMENT OF THE CASE

*Nature of the case:* The Texas Constitution requires home equity loans to have "substantially equal" payments. Tex. Const. art. XVI, § 50(a)(6)(L). This prevents payment shocks and payment volatility throughout the life of the loan. The appellant borrowers agreed, when in financial distress, to abandon their original payment schedules to new schedules featuring unusually low payments at first but large payment shocks later. Nationstar, upon the required notice of violation from the borrowers, admitted Constitutional violations yet refused to cure the even the violations it admitted to. The borrowers then filed suit to declare the violations and, for themselves alone, the Constitutionally-mandated penalty of forfeiture. For the proposed class of Texas home equity borrowers, Appellants sought cures for the payment shocks.

*Trial court:* Hon. Lora J. Livingston, 261st District Court of Travis County, Texas.

*Course of proceedings:* In this proposed class action within an MDL, the borrowers seek a declaration that an agreement after closing to abandon a home equity loan's substantially-equal payments violates the Texas Constitution. Nationstar answered with a general denial and affirmative defenses. It sought summary judgment dismissing Appellants' claims as a matter of law. The borrowers did not seek summary judgment because of one-way intervention, which constrains class action plaintiffs from seeking summary judgment before a class is certified.

*Disposition below:* With no material facts in dispute, the district court granted a general summary judgment to Nationstar and entered final judgment that Appellants take nothing. (Appendix A).

2

# ISSUES PRESENTED

The trial court erred in granting the defendant lender's motion for summary judgment against the plaintiff home equity borrowers. Specifically:

1. The Texas Constitution requires that home equity loans be scheduled to be repaid in "substantially equal" installments for the life of the loan, regardless whether interest-only payments or a balloon payment seem like a good deal in the short run or stave off foreclosure temporarily. Did the trial court err in holding:

   a. that the parties can agree after closing to override the Constitutional requirement of "substantially equal" payments?

   b. that a schedule of payments with extremely low teaser payments for several years followed by a sudden quadrupling or quintupling of the payments is "substantially equal"?

   c. that home equity loan payments can be interest-only, with no principal component, thereby generating payment shocks later?

2. Nationstar sent a routine notice to the borrowers when their interest-only periods ended, informing the borrowers that a payment spike of quadruple or quintuple the prior payments was about to kick in. Did the trial court err in determining that Nationstar's notice implementing an illegal payment spike somehow operates as a cure for that illegal payment spike?

## INTRODUCTION

The appellant home equity borrowers maintain that no matter how willing a desperate or unqualified borrower may be to waive certain perpetual, cornerstone protections in Tex. Const. art. XVI, § 50(a)(6), a lender is always forbidden to offer loan terms that violate those protections -- no matter how good the deal may seem at first. The protections include the following:

- there is **no personal recourse** against the borrower -- the amount yielded by a foreclosure sale is all the lender can collect;

- the loan is **not open-ended**, meaning additional credit cannot be extended from time to time;

- there is **no penalty for early repayment**;

- there is **no non-judicial foreclosure** -- either a Tex. R. Civ. P. 736 expedited foreclosure proceeding or a lawsuit for judicial foreclosure is required;

- the loan **cannot be accelerated** for various happenings, such as a decline in the value of the homestead property; and

- there must be **"substantially equal payments"** for the life of the loan.

Facially mandatory and perpetual terms like these would be meaningless if they could be bargained away after closing. And it would particularly frustrate the remedial aims of Section 50 to soften or eliminate these requirements during times of borrower financial distress, when the borrower can be coerced into accepting

prohibited loan terms as part of a deal to prevent an imminent foreclosure.

Section 50(a)(6)(L), the specific requirement at issue in this case, in essence protects home equity borrowers from payment volatility by mandating "substantially equal" payments. It thus forbids "teaser" payments that generate ticking foreclosure time bombs like balloons or payment spikes. Thus, even if a borrower agrees wholeheartedly to artificially-low payments for a few years in exchange for substantially-higher payments later, Section 50 invalidates that agreement to protect borrowers from their own folly -- and from lender coercion. To take another example, if a lender offers to modify an existing home equity loan to lower the interest rate in exchange for the borrower agreeing to become personally liable on the note, a borrower might think that's a good deal since it saves the borrower money and prevents a foreclosure. Nevertheless, it is a prohibited agreement: Section 50's mandatory, perpetual loan terms even if the borrower is willing to bargain those terms away.

Section 50 places the risk of illegal terms on the lender, but it also affords the lender 60 days following notice to cure the illegality. Cures are not difficult. In the personal-recourse example

5

above, the lender could cure the illegality by making the loan non-recourse again. Any express allowance for nonjudicial foreclosure would likewise have to be struck. Balloon-notes have to be cured in a way that maintains the low payment the borrower initially had, with, at most, very gradual periodic rises thereafter.

Appellants Graze and Criddle, in order to avoid foreclosure, agreed to give up their original Constitutionally-compliant, substantially-equal payment schedules. Nationstar was offering to roll all their past-due amounts back into their loans, which would give the borrowers a fresh start but which would also substantially increase their principal and necessitate a reamortization of the schedule of payments. Though that meant that the borrowers had lost ground on paying down their loans, Nationstar also offered to drastically reduce the interest rate for two years, effectively turning Appellants' fixed-rate notes into variable-rate notes. As a further enticement, Nationstar teased the borrowers with a 2-year break from repaying the re-upped principal. But after that, the higher principal would kick in over a compressed time period; the interest rate would spike several-fold; and the borrowers' payments would suddenly quadruple (Graze) or quintuple

6

(Criddle).[1]

When Appellants' interest-only periods ended and they faced what amounted to a balloon payment[2] in the middle of the schedule, they notified Nationstar that the schedule was illegal and asked for a cure that maintained payment equality. Nationstar not only failed to cure, but confessed that it too thought that their modifications violated the Texas Constitution! It was a candid response under the circumstances and one that should have led Nationstar to cure the loans. However, not only did Nationstar not cure, it began the process of foreclosing on loans it thought were invalid.

## STATEMENT OF FACTS

Undisputed loan documents in the record establish all the salient facts. Graze and Criddle each got home equity loans from Nationstar in the mid-2000's. CR209-239 (Graze); CR268-300 (Criddle). These were fixed-rate loans that scheduled 30 years of "substantially equal" payments per Section 50(a)(6)(L). CR209-10, 268-69. Neither Graze nor Criddle disputes the legality of their original loans. Years later, however, when Graze and

---

[1] Other borrowers in this MDL, such as Mr. Guerra, had payment jumps of more than *ten times* the interest-only payments.

[2] "Balloon" per 7 Tex. Admin. Code § 153.1(1).

Criddle were in financial distress, they agreed to modify their loans in several respects, including amending the original notes' payment schedules to affirmatively remove them from compliance with Section 50(a)(6)(L)'s "substantially equal payments" requirement.

**Gregory Graze's loan**

Graze's 2003 home equity loan originally recited 30 years of payments of $1,896.00 on principal of $300,000. CR209-10; CR268-69. Over time, Graze paid the principal balance down to $271,672. CR253. When he was in financial straits in 2010, Graze agreed to a loan modification that added $24,000 in past-due amounts back into the note, but with the same maturity date as before. CR253; App. D. The modification addressed the immediate impact of this higher principal in a shorter payoff period by drastically reducing the interest rate and scheduling two years of interest-only payments of $493.27, a mere fraction of the original loan payment. App D. When principal payments resumed, however, Graze's interest rate more than tripled, and his payment more than quadrupled, shooting from $493.27 to $2,159.71. App. D.

Graze attempted to get another modification at that point

8

because he couldn't afford the balloon payment. CR346; *see* 7 Tex. Admin. Code § 153.1(1) (2015) (any payment more than double the amount of prior payments is a "balloon" within the meaning of Section 50(a)(6)). Nationstar told him he was ineligible because he had a Texas home equity loan, which Nationstar has long maintained -- even through early 2015 -- cannot legally be modified. CR347. Nationstar told Graze that his prior modification had "probably" been a mistake. CR347.

Given Nationstar's admission, Graze formally notified Nationstar in February 2013 that his modification violated Section 50(a)(6), and in two ways: (1) adding new principal without the origination of a new home equity loan, as Nationstar admitted to Graze, and (2) scheduling interest-only payments, as Nationstar would admit to another borrower. CR347. In response, Nationstar wrote back to Graze *twice*, both times asserting its corporate position that modifications of Texas home equity loans that add past-due sums into the principal of the note violate the Texas Constitution. CR349, 351. Nationstar did not, however, offer any cure to Graze for what it continued to believe was a violation. CR340.

Nationstar has also taken the position that interest-only

payments violate Section 50: it admitted as much to MDL plaintiff Ernest Guerra around this time. CR363, 364-366. As with the capitalization of past-due amounts into principal, however, Nationstar chose not to cure Graze's interest-only payments by offering him a new schedule that maintained payment equality. *See* Section 50(a)(6)(Q)(x)(c), Section 50(a)(6)(Q)(x)(f) (cures). Instead, it noticed default and an intent to foreclose. CR343, 349.

**Cynthia Criddle's loan**

Criddle's 2006 home equity loan originally required 30 years of payments of $825.00 on principal of $100,800. CR268-69. When she was in financial straits in 2010, Criddle agreed to a loan modification that added $7,700 in past-due payments back into the note. CR302, 309. The modification blunted the impact of the higher principal in a shorter payoff period by scheduling 2 years of $177.00 interest-only payments at a 2% interest rate, resulting in near-term payments of a fraction of her original payment. CR302, 309. When principal payments resumed again, Criddle's interest rate increased nearly five-fold, from 2% to over 9%, and her payment spiked to $910, more than five times the prior scheduled payments. CR302.

Criddle sent Nationstar notice of the violation of Section 50(a)(6)(L) on January 28, 2013, and again on April 23, 2013. CR356, 358. She, like Graze, also asserted that the adding of past-due sums into the note required origination of a new home equity loan. Despite its corporate positions agreeing with Criddle on both counts, Nationstar failed to offer any cure under Section 50(a)(6)(Q)(x). CR354, 360. As it had with Graze, Nationstar noticed default and an intent to foreclose. CR372.[3]

**Other procedural and substantive matters**

Graze and Criddle each filed suit in Dallas County in 2013 after Nationstar refused to cure the illegalities it said existed. CR35, 52. In August, 2013, the MDL Panel, over Nationstar's opposition, ordered the Nationstar cases consolidated. App. E. Just over a year later, Judge Lora Livingston was appointed as the MDL judge. App. E. Graze and Criddle combined their suits into one proposed class action, the sole class action in the MDL.[4] CR10, 163. Graze and Criddle nonsuited their prior claim that past-due sums cannot be capitalized into the note because the

---

[3] Nationstar has continued into 2015 asserting to borrowers, despite *Sims* having been decided in mid-2014 as discussed below, that modifications that capitalize past-due sums into the note violate Section 50. CR367. The borrower who received CR367 is now an MDL plaintiff.
[4] Undersigned counsel represent all the plaintiffs in all the cases.

Texas Supreme Court validated capitalization modifications in 2014. CR167. *See Sims v. Carrington Mortgage Servs., L.L.C.*, 440 S.W.3d 10 (Tex. 2014, reh'g denied) ("restructurings" that merely add sums already owed are allowed so long as they don't change other loan terms).

Nationstar targeted this class action as the leading MDL case to challenge by summary judgment. CR186. Graze and Criddle filed a response but did not file a cross-MSJ owing to the Texas Supreme Court's concerns with one-way intervention. CR322, 323. *See* Tex. R. Civ. P. 42(c)(3); *see generally*, *Bally Total Fitness Corp. v. Jackson*, 53 S.W.3d 352, 355 (Tex. 2001). One-way intervention refers to the problem where potential members of an uncertified class are given an unfair advantage if they know the results on the merits of the case before they are forced to opt out or opt in. *Id.* at 355-57 (majority), 359-60 (dissent). The trial court held a hearing on Nationstar's motion on May 12, 2015.

## SUMMARY OF ARGUMENT

Section 50(a)(6) has both one-time requirements applicable only at closing and certain other requirements that are perpetual for the life of the loan. The one-time requirements include a closing at a lender, title company, or law office; various signature

12

and documentation requirements; and the requirement that the loan not exceed an 80% loan-to-value ratio as of the date of closing. The perpetual requirements include non-recourse against the borrower, mandatory judicial foreclosure, and substantial payment equality.

The perpetual, cornerstone requirements would be toothless if they could be amended away a month, a year, or a decade after the loan is closed. Any exception that allowed a borrower to give these Constitutional rights away after closing owing to the borrower's financial distress, or because waiving them seemed like a good deal in the near term, would be at odds with the long-term remedial aims of Section 50, since a desperate borrower will agree, in the heat of the moment, to almost anything to hang on to the homestead, only to rue that folly when the consequences hit home years or decades later. *See* Eliz. Olson, *Paying Off the Mortgage Is Becoming Harder for Older Workers*, NYT, June 12, 2015.[5]

Section 50(a)(6)(L) attacks in multiple ways the problem of "teaser payments" -- initial payments that are artificially low -- and the payment shocks that result:

- First, Section 50(a)(6)(L) requires that payments be

---

[5] Accessed at: http://www.nytimes.com/2015/06/13/your-money/paying-off-the-mortgage-is-becoming-harder-for-older-workers.html?emc=eta1&_r=0

"scheduled." That means there has to be an amortization of the precise amount of principal and interest owed that generates specific installment payments until payoff.

- Second, it requires that each installment "repay" the loan, meaning each payment has to include some principal.

- Third, payments must be "substantially equal." That rules out wild interest-rate swings, teaser periods that create payment spikes later, and balloon payments.[6]

Appellants originally asserted two practices as invalid under Section 50: (1) the volatile payment schemes, and (2) the capitalization of past-due sums into the note. They nonsuited the latter by amendment after the Texas Supreme Court decided in 2014, in *Sims v. Carrington Mortgage Services, LLC*, that home equity loans can be "restructured" to capitalize past-due sums back into the note without the origination of an all-new home equity loan complying for a second time with all the requirements of

---

[6] Though not at issue here, there is one more requirement. Each payment must pay all the interest due for that payment's installment period. Otherwise, the loan would be negatively amortizing: accrued but unpaid interest would be piling up, creating a payment shock (a balloon) later.

Section 50(a)(6). *Sims*, 440 S.W.3d 10.

The 2014 *Sims* decision, however, did not say that once a home equity loan has been modified to capitalize past-due sums, terms that *originally* complied can be *changed* to new terms that conspicuously do not -- in essence, that the loan is no longer bound *at all* by Section 50. That is Nationstar's interpretation, which construes *Sims* as giving lenders *carte blanche* to violate Section 50(a)(6) in every conceivable way if a borrower in financial distress is given what seems like a good deal in the short run but which actually bargains away important rights. If Nationstar's position were correct, the mere fact that the borrower had agreed to add past-due sums into the note to avoid foreclosure would also allow the borrower to waive judicial foreclosure and non-recourse liability. Yet those are indelible hallmarks of a Section 50(a)(6) loan. So too is the requirement of "substantially equal" payments, which looks forward decades and thus rules out any waiver by the parties.

*Sims* is also not factually on point since it did not involve a new, volatile payment schedule. Just the opposite: the Supreme Court stated that the borrowers' payments in *Sims* remained substantially equal after the modification, raising no issue under

Section 50(a)(6)(L). 440 S.W.3d at 16. According to *Sims*, the capitalization event, in and of itself, does not violate Section 50(a)(6)(L)'s substantial equality requirement *if* the capitalization restructuring "merely adjusts the regular installment amount." *Id.* Here, by contrast, the loan modifications affirmatively *abandoned* the substantially-equal payment terms of the original notes and changed them to interest-only schedules that led to payment shocks later. The Supreme Court didn't have to decide the legality of that practice because *Sims* didn't involve any change to the original payment scheme. Sims does not discuss balloons or interest-only schemes except by negative implication -- adding money to the note is fine so long as the "regular" payments are merely adjusted accordingly, with some principal and all interest part of each installment.

## ARGUMENT

### I. Standard of Review

Summary judgments are reviewed *de novo. Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex. 2005). A movant is entitled to traditional summary judgment if (1) there are no genuine issues as to any material fact and (2) the moving party is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c);

*Garrett Operators, Inc. v. City of Houston*, No. 01-13-00767-CV, 2015 WL 293305, at \*3 (Tex. App. - Houston [1st Dist.] 2015).

To obtain traditional summary judgment on an opposing party's claims, the movant must conclusively negate an element of each claim or conclusively establish each element of an affirmative defense. *See Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex. 1995).

If a final summary judgment order does not specify the particular ground on which it is based, the party appealing must show that each independent argument alleged in the motion for summary judgment is insufficient to support the trial court's order. *Ins. Co. of N. Am. v. Sec. Ins. Co.*, 790 S.W.2d 407, 410 (Tex. App. -- Houston [1st Dist.] 1990, no writ).

## II. Section 50(a)(6)(L) prohibits payment shocks even if -- *especially if* -- a borrower agrees to them

When interpreting the Texas constitution, the Court relies "heavily on its literal text and must give effect to its plain language." *Doody v. Ameriquest Mortg. Co.*, 49 S.W.3d 342, 344 (Tex. 2001). The Court strives to give constitutional provisions the effect their makers and adopters intended. *Id.*

***A. Section 50(a)(6) has both one-time requirements
and perpetual requirements***

Consumers get home equity loans to pledge their homesteads as the collateral for the purchase of consumer goods or the repayment of credit card debt, among other things. The Texas Constitution only allows foreclosure of such loans if stringent conditions to protect borrowers and prevent lender coercion are met. Tex. Const. art. XVI, § 50(a)(6); *see Fin. Comm'n of Texas v. Norwood*, 418 S.W.3d 566, 571, 588-89 (Tex. 2013, reh'g denied) (history and purposes of Section 50(a)(6)). In practice, home equity loans in Texas are usually the primary mortgage, either because they pay off Section 50(a)(1) purchase-money mortgages, or because someone who already owns a home wants to use the equity to buy a boat or take a vacation.

Some of the requirements of Section 50(a)(6) are one-time events at closing; others are perpetual for the life of the loan. An example of a one-time requirement is the 80% maximum loan-to-value ratio, which expressly applies only "*on the date the extension of credit is made.*" Section 50(a)(6)(B) (emph. added); *Sims v. Carrington Mortgage Servs., L.L.C.*, 440 S.W.3d at 17 (past-due sums added to loan are not an "extension of credit"). Section 50 would effectively bar home equity lending if it invalidated existing

loans for loan-to-value fluctuations. Another example of a one-time requirement is that the home equity loan "is the only debt secured by the homestead *at the time the extension of credit is made*." Section 50(a)(6)(K) (emph. added). And there are numerous documentation-type requirements that apply at closing. *See, e.g.*, Section 50(a)(6)(M), Section 50(a)(6)(N), Section 50(a)(6)(P), Section 50(a)(6)(Q)(i)-(ix).

By way of contrast to the one-time 80% LTV requirement, a separate market-value-type requirement in Section 50 is not one-time but perpetual: a home equity loan "may not be accelerated because of a decrease in the market value." Section 50(a)(6)(J). "Not" in this instance has to mean "never" or else the prohibition would make no sense. If a house burns down after the loan is made, the lender cannot put the borrower in a squeeze by accelerating the loan just because the collateral has been destroyed. Likewise, when a recession reduces property values, the borrower has a right to continue with an upside-down loan.

The perpetual requirements tend to be cornerstone protections for borrowers. For example, home equity loans can only be foreclosed judicially. Section 50(a)(6)(D). A lender cannot get a personal judgment on the note, meaning the loan is non-recourse.

Sections 50(a)(6)(C). These and other provisions are existential features of a Texas home equity loan. They represent a conclusive pronouncement by Texans who voted to adopt Section 50 in 1997 that it does not help borrowers for such protections to be waived, whether before or after origination. Non-judicial foreclosure and personal-recourse are forbidden as long as the loan lasts because they are intrinsic to what a Texas home equity loan is. *See also, e.g.*, Sections 50(a)(6)(F) (no open-end lending); Section 50(a)(6)(G) (payable in advance without penalty); 7 Tex. Admin. Code § 153.14(2)(C) (2008) (modification cannot provide for terms that would have been prohibited at closing).

The specific provision at issue here -- the prohibition on payments that are not "substantially equal" -- is also a cornerstone, perpetual provision. Section 50(a)(6)(L). If it did not apply for the duration of the loan, but only at closing, borrowers would go stand in a different line after closing to get lower payments for the first few years, hoping that the future would bring a job promotion or a winning lottery ticket. And borrowers in a recession are even more likely to want "teaser" payments that, for a time at least, make the loan affordable, only to generate harsh "payment shocks" later. *See generally* Ann Graham, *Where*

*Agencies, the Courts, and the Legislature Collide: Ten Years of Interpreting the Texas Constitutional Provisions for Home Equity Lending*, 9 Tex. Tech Admin. L.J. 69, 84 (2007) (balloons and teaser periods generating "shocking" payments are not permitted); *see also* Olson, *Paying Off the Mortgage*, cited above ("Tapping into home equity is one of the reasons older people run real risks of foreclosure."). Section 50(a)(6)(L) doesn't assume that the best-case scenarios in life always play out. It addresses the sober reality that, sometimes, things fall apart. That's why, in the Section 50 world, payment shocks are always bad and substantially-equal payments are a paramount consumer protection.

### B. Section 50(a)(6)(L) prevents payment shocks in multiple ways

Section 50(a)(6)(L) has three distinct components relevant to this case:

> The homestead . . . is hereby protected from forced sale, for the payment of all debts except for . . . an extension of credit that . . . is **scheduled** to be **repaid** . . . in **substantially equal** . . . **installments** . . . .

The Texas Joint Financial Regulatory Agencies have issued interpretive regulations that flesh out these requirements. *See* Section 50(a)(6)(u) (referral of authority); 7 Tex. Admin. Code § 153.1(1) (2015) (definition of balloon); 7 Tex. Admin.

Code § 153.11 (2008) (detailed regulations); 7 Tex. Admin. Code § 153.16 (2004) (more detailed regulations).

### 1. "Scheduled" means the amortization of a specific amount of principal and interest

The easy-to-overlook term "scheduled" is important. It assumes an agreement by the parties on a specific amount of principal and interest that establish the exact payment for three decades. In the case of fixed-rate notes like those at issue here, the "schedule" leaves no doubt what the payment is since all the parameters are fixed -- the sum of principal and interest, the interest rate, and the term. *See* 7 Tex. Admin. Code § 153.11 (regulation interpreting Section 50(a)(6)(L)). "Substantial equality" is a foregone conclusion for fixed-rate notes that fully amortize from inception. In the case of variable-rate notes, "substantially equal" dictates a schedule of gradual steps or tiers rather than large spikes in the interest rate or payment. *See* 7 Tex. Admin. Code § 153.16; *see generally Cerda v. 2004-EQR1 L.L.C.*, 612 F.3d 781, 791 (5th Cir. 2010) (discussion of fixed and variable rate home equity loans). Every schedule the parties agree upon during the life of the loan has to feature "substantially equal" payments in order for Section 50(a)(6)(L) to have teeth.

### 2. *"Repaid" means that every "installment" must repay some principal*

Payments that don't include any principal don't "repay" the loan. All they pay is the lender's profit on the loan -- the interest. Furthermore, interest-only payments don't repay the loan "in installments" since principal doesn't kick in at all until years later. When it does kick in, if the maturity date stays the same then principal gets compressed into fewer payments, increasing the amount of principal that must be included with each payment following the period of interest-only payments. The regulations address these related volatility concepts by concluding, sensibly, that every installment has to include some principal. *See* 7 Tex. Admin. Code § 153.11(3); 7 Tex. Admin. Code § 153.16(2). In practice, this means that the numbers are plugged into standard amortization calculators[7] that generate typical payment schedules that steadily and gradually repay a loan.

The only case construing Section 50(a)(6)(L), a 5th Circuit case, strongly affirms the requirement that principal be paid every month as part of the package deal of requirements that prevent payment shocks and payment volatility:

> '[T]o have substantially equal installments would require that some amount of principal must be reduced

---

[7] Widely-used calculators are available at www.bankrate.com.

> with each installment. This effectively precludes the permissibility of balloon payments.' (discussing Tex. Const. art. XVI, § 50(a)(6)(L))). This construction gives effect to both § 50(a)(6)(L) and (a)(6)(*O*) while still offering three forms of protection to the borrower: (1) if all payments are made according to schedule, the loan will be fully extinguished; (2) at the end of the loan's term, the borrower will not have to worry about obtaining a second loan to satisfy the balloon payment; and (3) the borrower will not be confronted with large month-to-month variations in payment amount.

*Cerda*, 612 F.3d at 791 (quoting official regulatory commentary). It is also apparent from this discussion in *Cerda* that the prohibition on payment shocks must be perpetual since the emphasis is on the loan being paid off at the *end* of its life.

### 3. "Substantially equal" does not allow a sudden quadrupling of the monthly payment

The new payment schedules in Appellants' loan modifications scheduled payments that dropped several-fold for a two-year period -- the interest-only period -- and then jumped back up even more after that -- when the new, higher principal sum kicked in over a compressed time period until maturity. That degree of volatility dispels any notion of "substantially equality" in this case. The regulations define any payment more than double the prior payments as a balloon -- the bellweather of payment shock -- and Appellants' payment jump far exceeded that. 7 Tex. Admin.

Code § 153.1(1).

Nationstar tries to minimize the obvious payment volatility by simply ignoring the years of interest-only payments, arguing that the payments following the interest-only period are only slightly higher than the original payments. CR196-97. But a two-year period is a significant period of the loan -- and in people's lives. In several of the MDL cases, Nationstar strung modifications together to create several years of declining payments, only to generate an inevitable payment spike four years later.[8] In other pending cases on the federal side, the interest-only period was 5 years. *See Hawkins v. JP Morgan Chase Bank, N.A.*, No. 13-50086, 2015 WL 3505353, at *1 (5th Cir. June 4, 2015) (substituted op. following grant of reh'g), *motion to stay pending this case and petitions for rehearing and rehearing en banc filed* (June 9, 2015). In principal, the interest-only payments could be for the life of the loan, with a large balloon of the full principal due at maturity.

And while it's significant that nothing in Nationstar's arguments forbid many years of interest-only payments, the precise length of time that a borrower gets teaser payments is not

---

[8] In the MDL case *Christian v. Nationstar,* a series of modifications added more than $60,000 to a loan that was originally $144,000 and resulted in a several-fold increase in the payment after four years.

the salient inquiry: the "substantially equal" test asks how volatile the payments are, not how many months of teaser payments are allowed during recessions. Appellants' new payment schedules are textbook examples of the volatility proscribed by Section 50, with large payment spikes of several times the pre-modification payment coming due abruptly after 24 interest-only payments.

Relatedly, Nationstar argues that "nothing . . . prohibits lenders from temporarily reducing borrowers' monthly payments so they can keep their homes," but of course that is precisely what Section 50(a)(6)(L) facially prohibits. Temporarily-low payments and payment volatility *threaten* people's homes, just not in a way that they appreciate immediately. Section 50(a)(6)(L) abhors any schedule, "temporary" or otherwise, that creates payment shocks. Nationstar's argument for "temporary" relief proves too much, since it would permit interest-only payments for both new borrowers who could not otherwise afford the loan they want, and struggling borrowers who can't afford the loan they already have. The issue is not whether banks can help borrowers prevent foreclosure, such as by rolling past-due sums into the note, reducing interest rates, and extending the loan term: they can. The issue is whether they can jury-rig exotic payment schedules

26

that generate payment shocks in the process: they can't.

### *4. Plaintiffs' amended payment schedules violate Section 50(a)(6)(L) in multiple ways*

While Appellants' original home equity loans had substantially equal payments, their modifications amended away the loans' compliance with Section 50(a)(6)(L) in the following respects:

a. The modifications created new payment "schedules." Since the principal and interest rate changed dramatically relative to the original note, the loan had to be reamortized, and a new schedule based on the new parameters established. This is important because the schedule set out in the original note was entirely and irrevocably superseded once the modifications substituted new and different ones based on different assumptions.

b. The new payment schedule did not "repay" the loan for the first two years because there was no principal component to the payments for those years.

c. The payments were patently not "substantially equal." They were highly volatile given the magnitude of the payment variations, and in any event they

27

created payment shocks at the conclusion of the interest-only periods, when the interest rates and payments quadrupled or quintupled.

d. The new schedules created "balloons" of more than twice the prior "scheduled" payments, where "schedule" logically refers to the new schedule, not the superseded one that was based on a different set of loan figures. *See* 7 Tex. Admin. Code § 153.1(1) (definition of a balloon).

Section 50(a)(6)(L) is the last word on what "helps" borrowers, and by definition any payment schedule at any point in the life of the loan that runs afoul of Section 50(a)(6)(L) does not "help" a borrower. That is why the regulations provide that modifications cannot implement terms that would have been forbidden on the closing date. 7 Tex. Admin. Code § 153.14(2)(C). Payment shocks are a ticking time bomb and a direct threat to the homestead, even if teaser periods seem helpful.

## III. The trial court erred in concluding that Nationstar cured the violations of Section 50(a)(6)(L)

Section 50(a)(6) has a cure scheme that allows the lender to either cure voluntarily or else 60 days to cure upon notice from the borrower. Section 50(a)(6)(L). A "cure" is a written notice

28

modifying a prohibited term to a legal term or refinancing the loan to bring it into compliance. Section 50(a)(6)(Q)(x)(c); Section 50(a)(6)(Q)(x)(f). The cure cannot be worse than the disease -- the borrower cannot be required to pay more than otherwise required or pay any costs to get the cure. *Id*. Common sense dictates that a cure has to put the borrower in no worse position.

A cure in this case was straightforward and would not have cost Nationstar much if anything. All Nationstar had to do was get rid of the payment spikes at the end of the interest-only period. It is a given that Nationstar was willing to accept drastically lower interest than the original note, so Nationstar cannot be heard to complain about a variable rate. Nationstar should have implemented a step-wise, gradual increase in both the interest rate and the payments over a period of five years or so, whatever would yield substantially equal payments from the baseline established in the loan modifications. That's all that Section 50 requires, and it's all that Graze and Criddle seek for the proposed class if the Court reverses the district court.

Surprisingly, Nationstar pled as an affirmative defense that it did cure Appellants' loans. CR199-200. It asserts that certain letters it sent to the borrowers in 2012 constituted preemptive

offers to cure. These are the notices that Nationstar sent to Graze and Criddle informing them that their interest-only periods were ending and that their interest-rates and monthly payments were about to spike several-fold. App. 266, 321.

It was err for the trial court to conclude as a matter of law that Nationstar's notice-of-payment shock letters cured the violations of Section 50(a)(6)(L). These letters exemplify and implement the illegality. These letters enact the moment of payment shock agreed upon two years before. These letters call due mid-schedule balloon payments that the borrowers couldn't make and that would have led to foreclosure.

A cure would have informed the borrowers of the very opposite of what these letters say. A cure would have told the borrowers that to preserve payment equality, Nationstar had taken it upon itself to reamortize the loan to do as follows:

- maintain the payment recited in the modification agreements;
- pay some principal with every installment; and
- adjust the interest rate, maturity, and possibly the principal to whatever would pay the loan off in substantially equal installments.

This is exactly what the borrowers later gave Nationstar the opportunity to do when they sent Section 50(a)(6)(Q)(x) notices of violation in early 2013. Nationstar, far from referring back to any prior purported "cure," responded instead that it agreed with the borrowers that their modifications were illegal! Yet Nationstar took no action to undo the illegal payment schemes or even the violation it told the borrowers it had committed. Under these circumstances, the trial court's decision should be reversed, as Nationstar not only did not cure, but disclaimed and declined any cure.

## PRAYER FOR RELIEF

This Court should reverse the trial court's judgment for Nationstar and remand the case for further proceedings on Appellants' claim for declaratory judgment and Nationstar's remaining affirmative defenses. The Court should render judgment in Graze and Criddle's favor on Nationstar's affirmative defense that it cured the loans at issue since it would serve no purpose for that meritless defense to be litigated further. T.R.A.P. 43.3; *see Double Diamond, Inc. v. Saturn*, 339 S.W.3d 337, 347 (Tex. App.-Dallas 2011, rev. denied) (rendering judgment is appropriate upon reversal of a DJ on uncontested facts).

Respectfully submitted,
***/s/ JPS***
J. Patrick Sutton
Texas Bar No. 24058143
1706 W. 10th Street
Austin Texas 78703
Tel. (512) 417-5903/Fax. (512) 355-4155
*jpatricksutton@ jpatricksuttonlaw.com*


Jeffrey W. Hurt, Esq.
Texas Bar No. 10317055
10670 N. Central Expy Ste 450
Dallas, Texas 75231
Tel: (214) 382-5656/Fax: (214) 382-5657
*jwhurt@hurtberry.com*


Attorneys for Appellants


## CERTIFICATE OF SERVICE

I certify that on June 16, 2015, per T.R.A.P. 6.3(b), a true and correct copy of this brief was served by efiling and email on:

Thomas G. Yoxall
Daron Janis                             B. David L. Foster
Locke Lord LLP                          Locke Lord LLP
2200 Ross Avenue Suite 2200             600 Congress Avenue, Suite
Dallas TX 75201                         2200
*tyoxall@lockelord.com*                 Austin, Texas  78701
*djanis@lockelord.com*                  *dfoster@lockelord.com*


/s/ *J. Patrick Sutton*
Attorney for Plaintiffs-Appellants

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in Century Schoolbook 14-point for text and 12-point for footnotes. Spacing is expanded by .6 point for clarity. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i), if applicable, because it contains **5995** words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

/s/ *J. Patrick Sutton*
Attorney for Appellants

No. 03-15-00329-CV

# In The Court of Appeals For the Third District of Texas at Austin

GREGORY G. GRAZE AND CYNTHIA A. CRIDDLE, on behalf of themselves and all others similarly situated,

Appellants,

v.

NATIONSTAR MORTGAGE, LLC,

Appellee.

On Appeal from the 261st District, Travis County, Texas
MDL Pretrial Court No. D-1-GN-14-005248
Dallas County Originating Case No. DC-13-05406
MDL No. 13-0427

## APPELLANTS' APPENDIX

Appendix A:    Trial court final summary judgment order

Appendix B:    Tex. Const. art. XVI, § 50(a)(6)(A)-(Q)

Appendix C:    7 T.A.C. Ch. 153

Appendix D:    Loan modification agreements

Appendix E:    MDL orders consolidating cases (2013) and appointing pretrial judge (2014)

# APPENDIX A

Filed in The District Court
of Travis County, Texas

**MAY 2 0 2015**

At ___4:00___ P ___M.

Velva L. Price, District Clerk

CAUSE NO. D-1-GN-14-005248

MDL NO. 13-0427

| | | |
|---|---|---|
| IN RE: | § | IN THE DISTRICT COURT OF |
| | § | |
| NATIONSTAR MORTGAGE, LLC | § | TRAVIS COUNTY, TEXAS |
| TEXAS HOME EQUITY LOAN | § | |
| MODIFICATION LITIGATION. | § | 261ST JUDICIAL DISTRICT |

*Transferred from*
CAUSE NO. DC-13-05406

| | | |
|---|---|---|
| GREGORY G. GRAZE AND | § | IN THE DISTRICT COURT OF |
| CYNTHIA A. CRIDDLE, on behalf of | § | |
| themselves and all others similarly | § | |
| situated, | § | |
| *Plaintiffs,* | § | DALLAS COUNTY, TEXAS |
| | § | |
| v. | § | |
| | § | |
| NATIONSTAR MORTGAGE LLC, | § | |
| *Defendant.* | § | 160TH JUDICIAL DISTRICT |

## FINAL JUDGMENT AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On May 12, 2015, came on for hearing before the Court *Defendant's Motion for Summary Judgment* (the "Motion"). Having considered the Motion, the response thereto, the reply in support thereof, the evidence, the arguments of counsel, and all other material properly before the Court, the Court concludes that Nationstar Mortgage LLC ("Defendant") is entitled to judgment as a matter of law.

It is therefore **ORDERED** that the Motion is **GRANTED**. It is **FURTHER ORDERED** that Plaintiffs Gregory Graze and Cynthia A. Criddle ("Plaintiffs") shall take nothing from Defendant.

This is a final, appealable judgment that disposes of all claims in this case.



004037286



388

D-1-GN-14-005248

SIGNED this _____ day of May, 2015.

_____
THE HONORABLE LORA LIVINGSTON

APPROVED AS TO FORM:

_____
J. Patrick Sutton
  State Bar No. 24058143
*jpatricksutton@jpatricksuttonlaw.com*
THE LAW OFFICE OF J. PATRICK SUTTON
1706 W. 10th Street
Austin, Texas 78703
(512) 417-5903
(512) 355-4155 – Facsimile

Jeffrey W. Hurt
  State Bar No. 10317055
*jwhurt@hurtberry.com*
HURT & BERRY, LLP
10670 N. Central Expy Suite 450
Dallas, Texas 75231
(214) 382-5656
(214) 382-5657 – Facsimile

COUNSEL FOR PLAINTIFFS

389

B. David L. Foster
 State Bar No. 24031555
 *dfoster@lockelord.com*
LOCKE LORD LLP
600 Congress Avenue, Suite 2200
Austin, Texas  78701
(512) 305-4700
(512) 305-4800 – Facsimile

Thomas G. Yoxall
 Texas Bar No. 00785304
 *tyoxall@lockelord.com*
Daron L. Janis
 State Bar No. 24060015
 *djanis@lockelord.com*
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas  75201
(214) 740-8000
(214) 740-8800 – Facsimile

COUNSEL FOR DEFENDANT

390



APPENDIX B

# Tex. Const. art. XVI, § 50(a)(6)(A)-(Q) excerpts

**(a) The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for:**

. . .

**(6) an extension of credit that:**

(A) is secured by a voluntary lien on the homestead created under a written agreement with the consent of each owner and each owner's spouse;

(B) is of a principal amount that when added to the aggregate total of the outstanding principal balances of all other indebtedness secured by valid encumbrances of record against the homestead does not exceed 80 percent of the fair market value of the homestead on the date the extension of credit is made;

(C) is without recourse for personal liability against each owner and the spouse of each owner, unless the owner or spouse obtained the extension of credit by actual fraud;

(D) is secured by a lien that may be foreclosed upon only by a court order;

(E) does not require the owner or the owner's spouse to pay, in addition to any interest, fees to any person that are necessary to originate, evaluate, maintain, record, insure, or service the extension of credit that exceed, in the aggregate, three percent of the original principal amount of the extension of credit;

(F) is not a form of open-end account that may be debited from time to time or under which credit may be extended from time to time unless the open-end account is a home equity line of credit;

(G) is payable in advance without penalty or other charge;

(H) is not secured by any additional real or personal property other than the homestead;

(I) is not secured by homestead property that on the date of closing is designated for agricultural use as provided by statutes governing property tax, unless such homestead property is used primarily for the production of milk;

(J) may not be accelerated because of a decrease in the market value of the homestead or because of the owner's default under other indebtedness not secured by a prior valid encumbrance against the homestead;

(K) is the only debt secured by the homestead at the time the extension of credit is made unless the other debt was made for a purpose described by Subsections (a)(1)-(a)(5) or Subsection (a)(8) of this section;

**(L) is scheduled to be repaid:**

**(i) in substantially equal successive periodic installments, not more often than every 14 days and not less often than monthly, beginning no later than two months from the date the extension of credit is made, each of which equals or exceeds the amount of accrued interest as of the date of the scheduled installment;**

. . .

(M) is closed not before:

(i)  the 12th day after the later of the date that the owner of the homestead submits a loan application to the lender for the extension of credit or the date that the lender provides the owner a copy of the notice prescribed by Subsection (g) of this section;

(ii)  one business day after the date that the owner of the homestead receives a copy of the loan application if not previously provided and a final itemized disclosure of the actual fees, points, interest, costs, and charges that will be charged at closing. If a bona fide emergency or another good cause exists and the lender obtains the written consent of the owner, the lender may provide the documentation to the owner or the lender may modify previously provided documentation on the date of closing; and

(iii)  the first anniversary of the closing date of any other extension of credit described by Subsection (a)(6) of this section secured by the same homestead property, except a refinance described by Paragraph (Q)(x)(f) of this subdivision, unless the owner on oath requests an earlier closing due to a state of emergency that:

(a)  has been declared by the president of the United States or the governor as provided by law; and

(b)  applies to the area where the homestead is located;

(N)  is closed only at the office of the lender, an attorney at law, or a title company;

(O)  permits a lender to contract for and receive any fixed or variable rate of interest authorized under statute;

(P)  is made by one of the following that has not been found by a federal regulatory agency to have engaged in the practice of refusing to make loans because the applicants for the loans reside or the property proposed to secure the loans is located in a certain area:

(i)  a bank, savings and loan association, savings bank, or credit union doing business under the laws of this state or the United States;

(ii)  a federally chartered lending instrumentality or a person approved as a mortgagee by the United States government to make federally insured loans;

(iii)  a person licensed to make regulated loans, as provided by statute of this state;

(iv)  a person who sold the homestead property to the current owner and who provided all or part of the financing for the purchase;

(v)  a person who is related to the homestead property owner within the second degree of affinity or consanguinity; or

(vi)  a person regulated by this state as a mortgage broker; and

(Q)  is made on the condition that:

(i)  the owner of the homestead is not required to apply the proceeds of the extension of credit to repay another debt except debt secured by the homestead or debt to another lender;

(ii)  the owner of the homestead not assign wages as security for the extension of credit;

(iii)  the owner of the homestead not sign any instrument in which blanks relating to substantive terms of agreement are left to be filled in;

(iv)  the owner of the homestead not sign a confession of judgment or power of attorney to the lender or to a third person to confess judgment or to appear for the owner in a judicial proceeding;

(v)  at the time the extension of credit is made, the owner of the homestead shall receive a copy of the final loan application and all executed documents signed by the owner at closing related to the extension of credit;

(vi)  the security instruments securing the extension of credit contain a disclosure that the extension of credit is the type of credit defined by Section 50(a)(6), Article XVI, Texas Constitution;

(vii)  within a reasonable time after termination and full payment of the extension of credit, the lender cancel and return the promissory note to the owner of the homestead and give the owner, in recordable form, a release of the lien securing the extension of credit or a copy of an endorsement and assignment of the lien to a lender that is refinancing the extension of credit;

(viii)  the owner of the homestead and any spouse of the owner may, within three days after the extension of credit is made, rescind the extension of credit without penalty or charge;

(ix)  the owner of the homestead and the lender sign a written acknowledgment as to the fair market value of the homestead property on the date the extension of credit is made;

**(x)  except as provided by Subparagraph (xi) of this paragraph, the lender or any holder of the note for the extension of credit shall forfeit all principal and interest of the extension of credit if the lender or holder fails to comply with the lender's or holder's obligations under the extension of credit and fails to correct the failure to comply not later than the 60th day after the date the lender or holder is notified by the borrower of the lender's failure to comply by:**

(a)  paying to the owner an amount equal to any overcharge paid by the owner under or related to the extension of credit if the owner has paid an amount that exceeds an amount stated in the applicable Paragraph (E), (G), or (O) of this subdivision;

(b)  sending the owner a written acknowledgement that the lien is valid only in the amount that the extension of credit does not exceed the percentage described by Paragraph (B) of this subdivision, if applicable, or is not secured by property described under Paragraph (H) or (I) of this subdivision, if applicable;

**(c)  sending the owner a written notice modifying any other amount, percentage, term, or other provision prohibited by this section to a permitted amount, percentage, term, or other provision and adjusting the account of the borrower to ensure that the borrower is not required to pay more than an amount permitted by this section and is not subject to any other term or provision prohibited by this section;**

(d)  delivering the required documents to the borrower if the lender fails to comply with Subparagraph (v) of this paragraph or obtaining the appropriate

signatures if the lender fails to comply with Subparagraph (ix) of this paragraph;

(e) sending the owner a written acknowledgement, if the failure to comply is prohibited by Paragraph (K) of this subdivision, that the accrual of interest and all of the owner's obligations under the extension of credit are abated while any prior lien prohibited under Paragraph (K) remains secured by the homestead; or

**(f) if the failure to comply cannot be cured under Subparagraphs (x)(a)-(e) of this paragraph, curing the failure to comply by a refund or credit to the owner of $1,000 and offering the owner the right to refinance the extension of credit with the lender or holder for the remaining term of the loan at no cost to the owner on the same terms, including interest, as the original extension of credit with any modifications necessary to comply with this section or on terms on which the owner and the lender or holder otherwise agree that comply with this section;**

. . .

# APPENDIX C

# 7 T.A.C. Ch. 153 Excerpts

## 7 T.A.C. § 153.1(1) (2015)

Balloon--an installment that is more than an amount equal to twice the average of all installments scheduled before that installment.

## 7 T.A.C. § 153.11 (2008)

Unless an equity loan is a home equity line of credit under Section 50(t), the loan must be scheduled to be repaid in substantially equal successive periodic installments, not more often than every 14 days and not less often than monthly, beginning no later than two months from the date the extension of credit is made, each of which equals or exceeds the amount of accrued interest as of the date of the scheduled installment.

. . .

(3) For a closed-end equity loan to have substantially equal successive periodic installments, some amount of principal must be reduced with each installment. This requirement prohibits balloon payments.

## 7 T.A.C. § 153.14 (2008)

. . .

(2) Section 50(a)(6)(M)(iii) does not prohibit modification of an equity loan before one year has elapsed since the loan's closing date. A modification of a home equity loan occurs when one or more terms of an existing equity loan is modified, but the note is not satisfied and replaced. A home equity loan and a subsequent modification will be considered a single transaction. The home equity requirements of Section 50(a)(6) will be applied to the original loan and the subsequent modification as a single transaction.

(A) A modification of an equity loan must be agreed to in writing by the borrower and lender, unless otherwise required by law. An example of a modification that is not required to be in writing is the modification required under the Soldiers' and Sailors' Civil Relief Act.

(B) The advance of additional funds to a borrower is not permitted by modification of an equity loan.

(C) A modification of an equity loan may not provide for new terms that would not have been permitted by applicable law at the date of closing of the extension of credit.

(D) The 3% fee cap required by Section 50(a)(6)(E) applies to the original home equity loan and any subsequent modification as a single transaction.

## 7 T.A.C. § 153.16 (2004)

A lender may contract for and receive any fixed or variable rate of interest authorized under statute.

(1) An equity loan that provides for interest must comply with constitutional and applicable law. Interest rates on certain first mortgages are not limited on loans subject to the federal Depository Institutions Deregulation and Monetary Control Act of 1980 and the Alternative Mortgage Transaction Parity Act. Chapter 342 of the Texas Finance Code provides for a maximum rate on certain secondary mortgage loans. Chapter 124 of the Texas Finance Code and federal law provide for maximum rates on certain mortgage loans made by credit unions. These statutes operate in conjunction with Section 50(a) and other constitutional sections.

(2) An equity loan must amortize and contribute to amortization of principal.

(3) The lender may contract to vary the scheduled installment amount when the interest rate adjusts on a variable rate equity loan. A variable-rate loan is a mortgage in which the lender, by contract, can adjust the mortgage's interest rate after closing in accordance with an external index.

(4) The scheduled installment amounts of a variable rate equity loan must be:

(A) substantially equal between each interest rate adjustment; and

(B) sufficient to cover at least the amount of interest scheduled to accrue between each payment date and a portion of the principal.

(5) An equity loan agreement may contain an adjustable rate of interest that provides a maximum fixed rate of interest pursuant to a schedule of steps or tiered rates or provides a lower initial interest rate through the use of a discounted rate at the beginning of the loan.

# APPENDIX D

_____ [Space Above This Line For Recording Data] _____

Loan #: ████ 3588

# LOAN MODIFICATION AGREEMENT
### (Providing for Interest Only Payments and Fixed Interest Rate)

This Loan Modification Agreement ("Agreement"), made this    18th day of October, 2010  , between    Gregory G. Graze ("Borrower") and Nationstar Mortgage LLC   formerly known as Centex Home Equity Company    ("Lender"), amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), and Timely Payment Rewards Rider, if any, dated   September 18, 2003   and recorded in Book or Liber _____, at page(s) _____, of the _____ Records of _____
(Name of Records)                                            (County and State, or other Jurisdiction)
and (2) the Note, bearing the same date as, and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at

6722 Orchid Lane Dallas Tx 75230
(Property Address)

the real property described being set forth as follows:

     In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1. As of   December 01, 2010  , the amount payable under the Note and the Security Instrument (the "Unpaid Principal Balance") is U.S. $   295,961.53  , consisting of the unpaid amount(s) loaned to Borrower by Lender plus any interest and other amounts capitalized.

2. Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of Lender.  Interest will be charged on the Unpaid Principal Balance at the yearly rate of   2 %, from   November 01, 2010 . Borrower promises to make monthly payments of interest of U.S. $   493.27  , beginning on the    1st day of December, 2010  , and continuing thereafter on the same day of each succeeding month until   November 01, 2012   (the "Interest Only Period"). Thereafter, Borrower shall make payments of principal and interest of U.S. $   2,159.71   based on the yearly rate of   6.5 %, which will remain in effect until principal and interest are paid in full. If on   October 01, 2033   (the "Maturity Date"), Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date.

3. Failure to Timely Remit Payments:  If at any time during the effective dates of this Modification Agreement the Borrower fails to timely make payments as specified hereinabove and such default or failure continues for more than thirty (31) days, then this Modification Agreement, at the option of Lender, shall terminate and all terms of the Note as originally executed shall be reinstated in full, effective as of the date of this Modification Agreement, and the amounts due and payable under the terms of the Note shall be as originally stated therein, as if this Modification Agreement had never existed.  Time is of the essence with regard to all payments specified hereunder.  Nothing contained herein shall prevent or preclude Lender from enforcing any of Lender's rights or remedies under the Note, or under any document or instrument evidencing or securing the indebtedness created by or under the Note, or shall be construed as a waiver of any of Lender's rights or remedies thereby created.

4. If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

5. Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument.

6. Borrower understands and agrees that:

(a) All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

(b) All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender.

(c) Borrower has no right of set-off or counterclaim, or any defense to the obligations of the Note or Security Instrument.

(d) Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

(e) All costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Borrower and shall be secured by the Security Instrument, unless stipulated otherwise by Lender.

(f) Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower.

_____ (Seal)
Nationstar Mortgage LLC-Lender

_____ (Seal)
Gregory G. Graze -Borrower

By: _____

_____ (Seal)
-Borrower

STATE OF TX            )
                       )SS.
COUNTY OF Dallas       )

On the 18 day of October, 2010, personally appeared before me _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signatures on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal

_____
Notary Public

My appointment expires: _____

BELLA RAHLIS
Notary Public
STATE OF TEXAS
My Comm. Exp. 07-09-13

_____ [Space Below This Line for Acknowledgements] _____

LOAN MODIFICATION AGREEMENT — Cap Fixed(Temp IO)                   04/27/2010   (page 1 of 3)

[Space Above This Line For Recording Data]

**Loan #:** ▮▮▮▮3090

# LOAN MODIFICATION AGREEMENT
### (Providing for Interest Only Payments and Fixed Interest Rate)

This Loan Modification Agreement ("Agreement"), made this    27th day of April, 2010 , between   Charles A. Criddle  and Cynthia A. Criddle  ("Borrower") and Nationstar Mortgage LLC    ("Lender"), amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), and Timely Payment Rewards Rider, if any, dated  December 21, 2006  and recorded in Book or Liber _____, at page(s) _____, of the _____ Records of _____

     (Name of Records)                                     (County and State, or other Jurisdiction)

and (2) the Note, bearing the same date as, and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at

                        2705 Brushy Creek Trail Mesquite Tx 75181
                                 (Property Address)

the real property described being set forth as follows:

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1. As of  June 01, 2010 , the amount payable under the Note and the Security Instrument (the "Unpaid Principal Balance") is U.S. $ 106,453.51 , consisting of the unpaid amount(s) loaned to Borrower by Lender plus any interest and other amounts capitalized.

2. Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of Lender. Interest will be charged on the Unpaid Principal Balance at the yearly rate of  2 %, from  May 01, 2010 . Borrower promises to make monthly payments of interest of U.S. $ 177.42 , beginning on the  1st day of June, 2010 , and continuing thereafter on the same day of each succeeding month until  May 01, 2012  (the "Interest Only Period"). Thereafter, Borrower shall make payments of principal and interest of U.S. $ 910.43 based on the yearly rate of  9.19 %, which will remain in effect until principal and interest are paid in full. If on January 01, 2037  (the "Maturity Date"), Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date.

3. <u>Failure to Timely Remit Payments:</u> If at any time during the effective dates of this Modification Agreement the Borrower fails to timely make payments as specified hereinabove and such default or failure continues for more than thirty (31) days, then this Modification Agreement, at the option of Lender, shall terminate and all terms of the Note as originally executed shall be reinstated in full, effective as of the date of this Modification Agreement, and the amounts due and payable under the terms of the Note shall be as originally stated therein, as if this Modification Agreement had never existed. Time is of the essence with regard to all payments specified hereunder. Nothing contained herein shall prevent or preclude Lender from enforcing any of Lender's rights or remedies under the Note, or under any document or instrument evidencing or securing the indebtedness created by or under the Note, or shall be construed as a waiver of any of Lender's rights or remedies thereby created.

4. If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

MDL Nationstar_Criddle 000032   302
D.Appx. 101

LOAN MODIFICATION AGREEMENT— Cap Fixed(Temp IO)          04/27/2010   (page 2 of 3)

Loan #: ▆▆▆▆▆90

5. Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument.

6. Borrower understands and agrees that:

    (a) All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

    (b) All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender.

    (c) Borrower has no right of set-off or counterclaim, or any defense to the obligations of the Note or Security Instrument.

    (d) Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

    (e) All costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Borrower and shall be secured by the Security Instrument, unless stipulated otherwise by Lender.

    (f) Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower.

_____ (Seal)        *deceased*_____ (Seal)
Nationstar Mortgage LLC-Lender          Charles A. Criddle -Borrower

By: _____          *Cynthia A. Criddle* (Seal)
                                    Cynthia A. Criddle -Borrower

STATE OF Texas     )
                )SS.
COUNTY OF Dallas   )

On the 28th day of April 2010, personally appeared before me Cynthia A Criddle, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

*Sarah M. Williams*
Notary Public          My appointment expires: 2/17/2013

_____ [Space Below This Line for Acknowledgements] _____

SARAH M. WILLIAMS
Notary Public
State of Texas
My Comm. Exp. 02-17-2013

# APPENDIX E

```
===============
MDL No. 13-0427
===============
```

IN RE NATIONSTAR MORTGAGE, LLC
TEXAS HOME EQUITY LOAN MODIFICATION LITIGATION

```
=========================================
On Review by The Multidistrict Litigation Panel
=========================================
```

Chief Justice Stone delivered the unanimous opinion of the MDL Panel.

Rule 13 authorizes this panel to transfer "related" cases from different trial courts to a single pretrial judge if the transfer will: (1) serve the convenience of the parties and witnesses; and (2) promote the just and efficient conduct of the litigation. TEX. R. JUD. ADMIN. 13.3. Seven home equity borrowers have asked this panel to transfer six lawsuits pending in five different counties against a single defendant, Nationstar Mortgage, LLC, to an MDL pretrial court. For the reasons stated below, we grant the motion.

### BACKGROUND: HOME EQUITY LOANS AND THE TEXAS CONSTITUTION

Texas has a long history of carefully protecting family homesteads from foreclosure "by limiting the types of liens that can be placed upon homestead property." *LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 618 (Tex. 2007). "Texas became the last state in the nation to permit home-equity loans when constitutional amendments voted on by referendum took effect in 1997." *Id*. These loans allow homeowners "to use the equity in their home as collateral to refinance the terms of prior debt and secure additional loans at rates more favorable than those for consumer loans." *Id*. "Although home-equity lending is now constitutionally permissible, article XIV, section 50(a)(6) of the Texas Constitution still places a number of limitations on such lending." *Id*.

The home equity borrowers in the six pending lawsuits were in default on their loans when Nationstar offered a loan modification that would prevent foreclosure. Nationstar used the same, short loan modification form in each transaction. The home equity borrowers have sued Nationstar contending that the loan modifications violated the limitations contained in article XIV, section 50(a)(6). Primarily, the lawsuits focus on allegations that the loan modifications: (1) exceeded the 80% loan-to-value ratio limitation contained in section 50(a)(6)(B); and (2) permitted interest-only payments or contained a balloon payment in violation of section 50(a)(6)(L)'s limitation on the scheduling of payments.

### ARE THE CASES RELATED?

Under rule 13.2(f) cases are "related" if they involve "one or more common questions of fact." *See* TEX. R. JUD. ADMIN. 13.2(f). "While the rule requires common questions of fact, strict identity of issues and parties in the cases is not required and cases containing case-specific issues such as damages may still be transferred under Rule 13." *In re Delta Lloyds Ins. Co. of Houston*, 339 S.W.3d 384, 386 (Tex. M.D.L. Panel 2008).

"The claims in each of the [six] pending cases are based on [alleged] standard practices and procedures followed by" Nationstar in its business of modifying home equity loans. *In re Ocwen Loan Servicing, LLC Mortgage Servicing Litigation*, 286 S.W.3d 669, 672 (Tex. M.D.L. Panel 2007). The plaintiffs contend that Nationstar's standard policies and procedures were applied in each case to an identical loan modification form that each of the home equity borrowers was required to submit. Thus, the plaintiffs allege that Nationstar's "general business practice" and standard procedures used to modify home equity loans violate the Texas Constitution. *See In re State Farm Lloyds Hurricane Ike Litigation*, 392 S.W.3d 353, 354-55

(Tex. M.D.L. Panel 2012) (holding cases were related where plaintiffs alleged defendant had a "general business practice" of adjusting claims that unfairly tilted the process in its favor).

Nationstar responds that the cases are highly individualized because the terms of each of the loans being modified were different. This argument is similar to the argument made and rejected in *Ocwen Loan Servicing*, 286 S.W.3d at 672 (granting consolidation despite argument that servicing of each plaintiffs' mortgage loan was subject to "unique facts"). Although we continue to acknowledge that "every case is different," *In re Hurricane Rita Evacuation Bus Fire*, 216 S.W.3d 70, 72 (Tex. M.D.L. Panel 2006), discovery in these cases "will be aimed at disclosing the nature of [Nationstar's] common practices and procedures." *Ocwen Loan Servicing*, 286 S.W.3d at 672. Nationstar further responds that the plaintiffs' allegations "are not congruent with each other." However, "[a] rule 13 transfer of cases does not require that the cases be congruent or anything close to it." *In re Hurricane Rita Evacuation Bus Fire*, 216 S.W.3d at 72

Because the plaintiffs focus on Nationstar's standard practices and procedures, we hold that the six cases are related.

### WOULD TRANSFER FURTHER CONVENIENCE AND EFFICIENCY?

"In deciding whether transfer to a pretrial court will further the general MDL goals of convenience, efficiency, and justice, our more specific inquiry is whether transfer would: (1) eliminate duplicative and repetitive discovery, (2) minimize conflicting demands on witnesses, (3) prevent inconsistent decisions on common issues, and (4) reduce unnecessary travel." *In re State Farm Lloyds Hurricane Ike Litigation*, 392 S.W.3d at 355-56. "A fifth objective of the MDL process is to allocate finite judicial resources intelligently by minimizing the occasions when different judges decide the same or similar issues again and again." *Id*. at 356. "When one

trial judge has decided an issue that is common to a set of related cases, the legal system cannot afford to let other trial judges spend time deciding the issue again." *Id*.

As previously noted, consolidation will eliminate the duplicative and repetitive discovery that would be promulgated with regard to Nationstar's general business practices in modifying home equity loans to Texas borrowers. Most of this discovery as to Nationstar's standard practices will likely involve only a few corporate representatives or employees of Nationstar. Rule 13's concern for the convenience of witnesses encompasses employee witnesses. *See In re Hurricane Rita Evacuation Bus Fire*, 216 S.W.3d at 72. Consolidation will also ensure that issues relating to the application of article XIV, section 50(a)(6) of the Texas Constitution are decided the same way by allowing the pretrial judge to make consistent rulings. *See Ocwen Loan Servicing*, 286 S.W.3d at 672-73 (noting "similar legal issues will arise as to whether [the] standard practices and procedures give rise to liability under the commonly alleged theories"). Finally, consolidating these cases is an intelligent allocation of finite judicial resources and will prevent different trial judges from having to decide the same issues. *In re State Farm Lloyds Hurricane Ike Litigation*, 392 S.W.3d at 355-56

## CONCLUSION

Because the plaintiffs have shown that the six cases are related within the meaning of rule 13 and that transferring them to one pretrial court would serve the convenience of the parties and witnesses, the motion to transfer is granted. The pre-trial judge will be appointed by separate order.

PRESIDING JUDGE PEEPLES, CHIEF JUSTICE MCCLURE, AND JUSTICE BROWN, join.
JUSTICE LANG-MIERS, not participating.

_____
CATHERINE STONE,
CHIEF JUSTICE

**OPINION DELIVERED: AUGUST 16, 2013**

# ORDER OF MULTIDISTRICT LITIGATION PANEL

Order Pronounced October 1, 2014

## APPOINTMENT OF PRETRIAL JUDGE IN THE FOLLOWING MULTIDISTRICT LITIGATION CASE:

13-0427      IN RE NATIONSTAR MORTGAGE, LLC TEXAS HOME EQUITY LOAN MODIFICATION LITIGATION

On August 16, 2013, the MDL Panel granted the plaintiffs' motion for transfer pursuant to Rule 13 of the Texas Rules of Judicial Administration. The cases listed in Appendix A of the motion to transfer, and all tag-along cases if any, are hereby transferred to Judge Lora Livingston of the 261st District Court of Travis County.

Justice Lang-Miers did not participate.