# IN THE SUPREME COURT OF TEXAS

═══════════

No. 13-0638

═══════════

FRANKIE SIMS, ON BEHALF OF HIMSELF AND ALL OTHERS
SIMILARLY SITUATED; AND PATSY SIMS, ON BEHALF OF HERSELF
AND ALL OTHERS SIMILARLY SITUATED, APPELLANTS,

v.

CARRINGTON MORTGAGE SERVICES, L.L.C., APPELLEE

═══════════════════════════════════════════════

ON CERTIFIED QUESTIONS FROM THE
UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

═══════════════════════════════════════════════

**Argued December 4, 2013**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

To avoid foreclosure, homeowners and lenders often try to restructure underwater home mortgage loans that are in default by capitalizing past-due amounts as principal, lowering the interest rate, and reducing monthly payments, thereby easing the burden on the homeowners. But home equity loans are subject to the requirements of Article XVI, Section 50 of the Texas Constitution. The United States Court of Appeals for the Fifth Circuit has asked whether those requirements apply to such loan restructuring.[1] We answer that as long as the original note is not

---

[1] 538 F. App'x 537 (5th Cir. 2013) (per curiam); *see* TEX. CONST. art. V, § 3-c(a) ("The supreme court [has] jurisdiction to answer questions of state law certified from a federal appellate court.").

satisfied and replaced, and there is no additional extension of credit, as we define it, the restructuring is valid and need not meet the constitutional requirements for a new loan.

## I

Frankie and Patsy Sims obtained a 30-year home equity loan in 2003. In 2009, the Simses, behind on their payments, reached what was entitled a "Loan Modification Agreement" with Carrington Mortgage Services, L.L.C. The agreements involved capitalizing past-due interest and other charges, including fees and unpaid taxes and insurance premiums, and reducing the interest rate and monthly payments. Two years later, the Simses were again behind, and this time CMS sought foreclosure. The Simses resisted, asserting that the 2009 restructuring violated constitutional requirements for home equity loans. The parties then reached a second "Loan Modification Agreement", further reducing the interest rate and payments. The following chart summarizes the loan data at the outset and after the two restructurings:

|  | Principal | Amt. Cap'd | New Prin. | Rate | Payment | Appraisal |
|---|---|---|---|---|---|---|
| 2003 Loan | $76,000.00 | — | — | 9% | $611.51 | $96,000 |
| 2009 Mod. | $72,145.50 | $2,200.00 | $74,345.50 | 6.5% | $511.16 | $72,300 |
| 2011 Mod. | $72,655.61 | $7,368.44 | $80,023.95 | 4.75% | $492.34 | $73,000 |

The original note required the Simses to pay principal, interest, and late charges.[2] The security agreement echoed that requirement and added an obligation for the Simses to make

---

[2] The note signed by the Simses stated: "In return for a loan that I have received, I promise to pay U.S. $76,000.00 (this amount is called 'principal'), plus interest, to the order of the Lender." The note also provided for a 5% late charge on overdue principal and interest.

payments for "Escrow Items", such as taxes, assessments, and insurance premiums.[3] The security

agreement also authorized the lender to "do and pay for whatever is reasonable or appropriate" to

protect its interest in the property and its rights under the agreement and provided that any amount

the lender disbursed to that end "shall become additional debt of Borrower secured by this Security

Instrument." The 2009 and 2011 "Loan Modification Agreements" provided that all the Simses'

obligations and all the loan documents remained unchanged.[4]

Two months after the 2011 agreement, the Simses brought this class action against CMS in

the United States District Court, alleging that CMS's loan modifications for them and other similarly

situated borrowers violated Article XVI, Section 50 of the Texas Constitution. Before considering

certification, the court dismissed the case under Federal Rule of Civil Procedure 12(b)(6) for failure

to state a cause of action,[5] and the Simses appealed. After oral argument, the Fifth Circuit certified

the following four questions to us:

---

[3] The security instrument stated: "Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the 'Funds') to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; . . . and (c) premiums for any and all insurance required by Lender under Section 5. These items are called 'Escrow Items.'"

[4] The 2009 agreement stated: "All covenants, agreements, stipulations, and conditions in your Note and Mortgage will remain in full force and effect, except as modified herein, and none of your obligations or liabilities under your Note and Mortgage will be diminished or released by any provisions hereof, nor will this Agreement in any way impair, diminish, or affect [the] rights under or remedies on your Note and Mortgage."

Similarly, the 2011 Agreement stated: "[A]ll terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and [] except as otherwise specifically provided in, and expressly modified by, this Agreement, the Lender and you will be bound by, and will comply with, all of the terms and conditions of the Loan Documents."

[5] 889 F. Supp. 2d 883, 884 (N.D. Tex. 2012).

3

1. After an initial extension of credit, if a home equity lender enters into a new agreement with the borrower that capitalizes past-due interest, fees, property taxes, or insurance premiums into the principal of the loan but neither satisfies nor replaces the original note, is the transaction a modification or a refinance for purposes of Section 50 of Article XVI of the Texas Constitution?

If the transaction is a modification rather than a refinance, the following questions also arise:

2. Does the capitalization of past-due interest, fees, property taxes, or insurance premiums constitute an impermissible "advance of additional funds" under Section 153.14(2)(B) of the Texas Administrative Code?

3. Must such a modification comply with the requirements of Section 50(a)(6), including subsection (B), which mandates that a home equity loan have a maximum loan-to-value ratio of 80%?

4. Do repeated modifications like those in this case convert a home equity loan into an open-end account that must comply with Section 50(t)?

## II

As we have more fully explained in prior decisions, because of Texas' strong, historic protection of the homestead, home equity loans are regulated, not by statute as one might suppose, but by the "elaborate, detailed provisions" of Article XVI, Section 50 of the Texas Constitution.[6] To provide guidance to lenders, the Finance Commission and the Credit Union Commission have been authorized by the Constitution and by statute to interpret these provisions, subject to judicial review,[7] and the Commissions have done so in Chapter 153 of the Texas Administrative Code.[8] "A

---

[6] *Fin. Comm'n of Tex. v. Norwood*, 418 S.W.3d 566, 571 (Tex. 2013); *see also LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 618 (Tex. 2007) (per curiam) ("Texas became the last state in the nation to permit home-equity loans when constitutional amendments voted on by referendum took effect in 1997.").

[7] *Norwood*, 418 S.W.3d at 573; TEX. CONST. art. XVI, § 50(u).

[8] 7 TEX. ADMIN. CODE §§ 153.1-.96

lender's compliance with an agency interpretation of Section 50, even a wrong interpretation, is compliance with Section 50 itself."[9] Thus, in answering the certified questions, we look to the constitutional text and the Commissions' interpretations. However, those interpretations "can do no more than interpret the constitutional text, just as a court would."[10] The issue is not whether a lending practice or policy is advisable, something the Commissions would decide in exercising their regulatory functions; the issue is what the Constitution requires.[11]

## A

The certified questions assume a distinction between a loan modification and a refinancing that, if understood in financial circles,[12] is not clear in the text of Section 50. Neither concept is defined in Section 50. The word "refinance" is used eleven times in Section 50, and "refinancing" once.[13] In each instance, the reference seems to be to a redone transaction. A form of the word

---

[9] *Norwood*, 418 S.W.3d at 573.

[10] *Id.* at 585.

[11] *Id.*

[12] CMS points to the Federal Reserve Board's definition of a "refinancing" requiring new Truth In Lending Act disclosures under Regulation Z when refinancing is undertaken by the original creditor, or a holder or servicer of the original obligation. Under this definition, a refinancing is "a new transaction requiring new disclosures" that "occurs when an existing obligation that was subject to [federal "closed end credit" disclosure requirements] is satisfied and replaced by a new obligation". 12 C.F.R. § 226.20(a); 12 C.F.R. pt. 226, supp. 1, cmt. 20(a) (Official Staff Interpretations). Some transactions, however, will not be treated as a refinancing under this section, including "[a] change in the payment schedule or a change in collateral requirements as a result of the consumer's default or delinquency, unless the rate is increased, or the new amount financed exceeds the unpaid balance plus earned finance charge and premiums for continuation insurance . . . ." *Id.* § 226.20(a)(4). The Federal National Mortgage Association, in an amicus brief, references the same regulation but does not otherwise attempt to define a distinction between refinancings and modifications. An amicus brief by the Independent Bankers Association of Texas, the Texas Bankers Association, and the Texas Mortgage Bankers Association refers to the distinction but does not attempt to define it. Other federal entities, like HUD and FDIC, have their own glossaries referring to and defining general terms like "modification," "mortgage modification," "refinancing," and "debt restructuring," but these agencies, to fulfill their specific missions, also define and apply more specific classifications or limitations.

[13] TEX. CONST. art. XVI, § 50(a)(4), (a)(6)(M)(iii), (a)(6)(Q)(vii), (a)(6)(Q)(x)(f), (a)(8); § 50(e) and (f).

5

"modify" is used in three places in Section 50. In one, lenders are authorized to "modify" previously provided documentation at closing in exigent circumstances.[14] In the other two, lenders can correct noncompliance with Section 50 by sending a borrower "notice modifying any . . . amount, percentage, term, or other provision prohibited by this section",[15] or, if noncompliance cannot be cured under the other provisions, by offering the borrower a $1,000 credit and "the right to refinance the extension of credit" for the remaining term at no cost "with any modifications necessary to comply" or that the parties agree will comply.[16] In these two instances, if not also in the first, a modification could substantially alter the loan; indeed, in the last situation, modifications can shape the refinancing.[17]

The modification–refinancing distinction is one drawn by the Commissions in interpreting Section 50(a)(6)(M)(iii). The effect of that provision is to prohibit a second home equity loan within a year of the first, with certain exceptions. As interpreted by the Commissions, the provision prohibits a "refinancing" like a "new equity loan" but not a "modification".[18] According to the

---

[14] *Id.* § 50(a)(6)(M)(ii).

[15] *Id.* § 50(a)(6)(Q)(x)(c).

[16] *Id.* § 50(a)(6)(Q)(x)(f).

[17] Section 153.96(b) of the Commissions' interpretations contemplates that in order to comply with constitutional requirements, "the lender . . . and borrower may . . . modify the equity loan without completing the requirements of a refinance". 7 TEX. ADMIN. CODE § 153.96(b)(2)(A).

[18] "§ 153.14. One Year Prohibition: Section 50(a)(6)(M)(iii)

"An equity loan may not be closed before the first anniversary of the closing date of any other equity loan secured by the same homestead property.

"(1)     Section 50(a)(6)(M)(iii) prohibits an owner who has obtained an equity loan from:

"(A)     **refinancing** the equity loan before one year has elapsed since the loan's closing date; or

Commissions, a modification does not involve satisfaction or replacement of the original note, an "advance of additional funds", or new terms that would not have been permitted for the original "extension of credit".[19]  Further, the original loan and a subsequent modification are treated as a single transaction, including for purposes of the 3% fee cap.[20]

But Section 50(a)(6)(M)(iii) of the Constitution does not mention refinancing or modification.  It states:

> (a)     The homestead . . . is . . . protected from forced sale[] for the payment of all debts except for: . . .
>
>> (6)     *an extension of credit* that: . . .

---

"(B)     obtaining a new equity loan on the same homestead property before one year has elapsed since the previous equity loan's closing date, regardless of whether the previous equity loan has been paid in full.

"(2)     Section 50(a)(6)(M)(iii) does not prohibit **modification** of an equity loan before one year has elapsed since the loan's closing date.  A modification of a home equity loan occurs when one or more terms of an existing equity loan is modified, but the note is not satisfied and replaced.  A home equity loan and a subsequent modification will be considered a single transaction.  The home equity requirements of Section 50(a)(6) will be applied to the original loan and the subsequent modification as a single transaction.

"(A)     A modification of an equity loan must be agreed to in writing by the borrower and lender, unless otherwise required by law.  An example of a modification that is not required to be in writing is the modification required under the Soldiers' and Sailors' Civil Relief Act.

"(B)     The advance of additional funds to a borrower is not permitted by modification of an equity loan.

"(C)     A modification of an equity loan may not provide for new terms that would not have been permitted by applicable law at the date of closing of the extension of credit.

"(D)     The 3% fee cap required by Section 50(a)(6)(E) applies to the original home equity loan and any subsequent modification as a single transaction."

7 TEX. ADMIN. CODE § 153.14 (emphasis added).

[19] *Id.* § 153.14(2).

[20] *Id.* § 153.14(2)(D).

(M)     is closed not before: . . .

(iii)     the first anniversary of the closing date of any other extension of credit described by Subsection (a)(6) of this section secured by the same homestead property [with certain exceptions] . . . .[21]

The applicability of this particular provision, as well as all of Section 50(a)(6), which governs home equity loans, depends not on whether the transaction is a modification or a refinance but on whether it is an "extension of credit". If the restructuring of a home equity loan does not involve a new extension of credit, the requirements of Section 50(a)(6) do not apply. Thus, we restate the first certified question as follows:

1. After an initial extension of credit, if a home equity lender enters into a new agreement with the borrower that capitalizes past-due interest, fees, property taxes, or insurance premiums into the principal of the loan but neither satisfies nor replaces the original note, is the transaction *a new extension of credit* for purposes of section 50 of Article XVI of the Texas Constitution?

**B**

Neither the Constitution nor the Commissions' interpretations define an "extension of credit", but its meaning is clear. Credit is simply the ability to assume a debt repayable over time, and an extension of credit affords the right to do so in a particular situation.[22]

---

[21] TEX. CONST. art. XVI, § 50(a)(6)(M)(iii) (emphasis added).

[22] *See*, *e.g.*, TEX. FIN. CODE § 31.002(a)(34) ("'Loans and extensions of credit' means direct or indirect advances of money . . . to a person that are conditioned on the obligation of the person to repay . . . ."); *id.* § 181.002(a)(28) (same); *id.* § 350.001(a) ("credit means the right granted to a debtor to defer payment of debt or to incur debt and defer its payment"); *id.* § 393.001 (4) ("'extension of consumer credit' means the right to defer payment"); *see also* 7 TEX. ADMIN. CODE § 12.3(a)(2) (defining "[l]oans or extensions of credit" for purposes of TEX. FIN. CODE § 34.201 as including various transactions involving an advance of funds to be repaid over time).

The Simses argue that any increase in the principal amount of a loan is a new extension of credit within the meaning of Section 50(a)(6), in effect equating the loan principal with an extension of credit. The Constitution contradicts the Simses' argument. Section 50(a)(6)(E) refers to principal as a component of an extension of credit, capping fees at "three percent of the original principal amount *of* the extension of credit".[23] The extension of credit for purposes of Section 50(a)(6) consists not merely of the creation of a principal debt but includes all the terms of the loan transaction. Terms requiring the borrower to pay taxes, insurance premiums, and other such expenses when due protect the lender's security and are as much a part of the extension of credit as terms requiring timely payments of principal and interest. The Simses argue that in restructuring a loan to capitalize past-due amounts, the lender is actually advancing additional funds to itself (past-due interest) or others (past-due taxes and insurance) to pay those amounts for the borrower, and that this constitutes a new extension of credit. But the borrower's obligation for such amounts, and the lender's right to pay them to protect its security, were all terms of the original extension of credit. The Simses argue that requiring interest on capitalized, past-due amounts is really a new loan, but it is simply a mechanism for deferring payment of obligations already owed in a way that allows the borrower to retain his home.

The Simses argue that a loan that can be restructured to change the amount of the periodic payments does not meet the requirement of Section 50(a)(6)(L)(i) that loans be "scheduled to be repaid . . . in substantially equal successive period installments".[24] But the required schedule is not

---

[23] TEX. CONST. art. XVI, § 50(a)(6)(E) (emphasis added).

[24] *Id.* § 50(a)(6)(L)(i).

9

one that, when initially set, can never be altered. After all, whenever a payment is missed, the schedule is altered. Further, Section 50(g) gives the borrower the right to prepay the loan,[25] which would alter the initial schedule. Section 50(a)(6) does not forbid a revision of the initial repayment schedule that merely adjusts the regular installment amount.

CMS argues that restructuring a loan does not involve a new extension of credit so long as the borrower's note is not satisfied or replaced and no new money is extended. We agree that these two conditions are necessary, but we cannot say with assurance that they are sufficient. For example, a restructuring to make the homestead lien security for another indebtedness, such as the borrower's consumer or credit card debt, would certainly be a new extension of credit. The test should be whether the secured obligations are those incurred under the terms of the original loan.

The Simses object that this test provides no effective limit on the size or frequency of additions to principal. But the terms of the original loan supply the limit. The Simses' argument is that any change in principal is a new extension of credit, but as we have shown, their position is inconsistent with Section 50.

The Simses argue that it matters not that, as in their own situation, restructuring lowers the interest rate and the amount of installment payments, and makes it possible for borrowers to keep their homes and meet their obligations. Lenders have two options other than foreclosing on loans in default: further forbearance and forgiveness. Nevertheless, the Simses' argument encourages lenders to foreclose, which is certainly at odds with the fundamental purpose of Section 50: to protect the homestead.

---

[25] TEX. CONST. art. XVI, § 50(g).

10

To the first certified question, we answer: the restructuring of a home equity loan that, as in the context from which the question arises, involves capitalization of past-due amounts owed under the terms of the initial loan and a lowering of the interest rate and the amount of installment payments, but does not involve the satisfaction or replacement of the original note, an advancement of new funds, or an increase in the obligations created by the original note, is not a new extension of credit that must meet the requirements of Section 50.

## C

Our reasons for answering the first question as we have largely dictate our answers to the other three certified questions.

Is the capitalization of past-due interest, taxes, insurance premiums, and fees an "advance of additional funds" under the Commissions' interpretations of Section 50?[26] No, if those amounts were among the obligations assumed by the borrower under the terms of the original loan. And more importantly, such capitalization is not a new extension of credit under Section 50(a)(6).

Must a restructuring like the Simses' comply with Section 50(a)(6)? No, because it does not involve a new extension of credit, for the reasons we have explained. The Simses argue that any restructuring must satisfy Section 50(a)(6)(B), which requires a home equity loan to be

> of a principal amount that when added to the aggregate total of the outstanding principal balances of all other indebtedness secured by valid encumbrances of record against the homestead does not exceed 80 percent of the fair market value of the homestead *on the date the extension of credit is made . . . .*[27]

---

[26] 7 TEX. ADMIN. CODE § 153.14.

[27] TEX. CONST. art. XVI, § 50(a)(6)(B) (emphasis added).

11

The Simses' argument incorrectly assumes that the restructuring is a new extension of credit.[28]

Finally, would repeated restructuring convert a home equity loan into an open-end account subject to Section 50(t)? Section 50(t) applies to a home equity line of credit — "a form of an open-end account that may be debited from time to time, under which credit may be extended from time to time and under which . . . the owner requests advances, repays money, and reborrows money". The repeat transactions are clearly contemplated from the outset.[29] This description does not remotely resemble a loan with a stated principal that is to be repaid as scheduled from the outset but must be restructured to avoid foreclosure.

*    *    *    *    *

Fundamentally, the requirements of Article XIV, Section 50 of the Texas Constitution for extensions of credit secured by the homestead are designed to protect the homestead, not endanger

---

[28] The Circuit noted that if the highlighted phrase modified the word "value" and not the word "exceed", the provision would never allow the loan principal, during the life of the loan, to exceed the amount that was the value of the property when the loan was closed. 538 F. App'x 537, 545-546 (5th Cir. 2013) (per curiam). This could happen if the loan-to-value ratio was very close to the limit at the time the loan closed, and when the loan was restructured, the amount capitalized caused the total principal indebtedness to exceed the limit. But nothing in Section 50 suggests that a loan's compliance is to be determined at any time other than when it is made.

[29] *See also* TEX. FIN. CODE § 301.002(a)(14)(A) ("In this subtitle . . . 'Open-end account' . . . means an account under a written contract between a creditor and an obligor in connection with which: (i) the creditor reasonably contemplates repeated transactions and the obligor is authorized to make purchases or borrow money; (ii) an interest or time price differential may be charged from time to time on an outstanding unpaid balance; and (iii) the amount of credit that may be extended during the term of the account is generally made available to the extent that any outstanding balance is repaid . . . .").

it.  The Constitution does not prohibit the restructuring of a home equity loan that already meets its requirements in order to avoid foreclosure while maintaining the terms of the original extension of credit.  We answer the certified questions accordingly.

_____
Nathan L. Hecht
Chief Justice

Opinion delivered: May 16, 2014