ACCEPTED
03-15-00329-CV
6045320
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/13/2015 4:29:26 PM
JEFFREY D. KYLE
CLERK

No. 03-15-00329-CV

# In The Court of Appeals For the Third District of Texas at Austin

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
7/13/2015 4:29:26 PM
JEFFREY D. KYLE
Clerk

GREGORY G. GRAZE AND CYNTHIA A. CRIDDLE, on behalf of themselves and all others similarly situated,

Appellants,

v.

NATIONSTAR MORTGAGE, LLC,

Appellee.

On Appeal from the 261st District, Travis County, Texas
MDL Pretrial Court No. D-1-GN-14-005248
Dallas County Originating Case No. DC-13-05406
MDL No. 13-0427

## REPLY BRIEF OF APPELLANTS

J. Patrick Sutton
Texas Bar No. 24058143
1706 W. 10th Street
Austin Texas 78703
Tel. (512) 417-5903
Fax. (512) 355-4155
*jpatricksutton@*
*jpatricksuttonlaw.com*

Jeffrey W. Hurt, Esq.
Texas Bar No. 10317055
10670 N. Central Expy Ste 450
Dallas, Texas 75231
Tel: (214) 382-5656
Fax: (214) 382-5657
*jwhurt@hurtberry.com*

Counsel for Appellants

July 13, 2015

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ......................................................................iii

INTRODUCTION ................................................................................ 1

ADDITIONAL FACTS IN REPLY................................................2

ARGUMENT IN REPLY ....................................................................3

    I. *Sims* briefly recapitulated .................................................. 4

    II. *Sims* addresses solely capitalization events, not changes to the terms of the original loan. ...................................................... 5

    III. New extensions of credit must satisfy *all* of Section 50(a)(6), but a mere modification may, separately, violate *any or all* of the particular requirements of Section 50(a)(6) ......................................... 11

    IV. Nationstar miscalculates the balloon............................................ 13

    V. Nationstar's purported cures *are* the violations of Section 50(a)(6)(L) ..................................................................... 15

    VI. The independent requirement that payments pay all interest coming due doesn't doesn't provide a safe-harbor for payments composed solely of interest................................................. 17

    VII. "Temporary" = Volatile = Bad ........................................ 18

CONCLUSION ..................................................................... 21

CERTIFICATE OF SERVICE ................................................. 23

CERTIFICATE OF COMPLIANCE ...................................... 23

# INDEX OF AUTHORITIES

### Cases

*Hawkins v. JP Morgan Chase Bank, N.A.*, No. 13-50086, 2015 WL 3505353 (5th Cir. June 4, 2015), *reh'g and reh'g en banc denied* (June 30, 2015) ........................................................................ 2, 3, 9

*Sims v. Carrington Mortgage Servs., L.L.C.*, 440 S.W.3d 10 (Tex. 2014, reh'g denied) ....................................................... *passim*

*Starkey et al. v. Bank of America, N.A.*, No. 4:12-cv-02084 (S.D. Tex. 2012) ............................................................................. 3

### Statutes and Rules

7 Tex. Admin. Code § 151.1(1) ............................................... 8, 14

7 Tex. Admin. Code § 153.14 ..................................................... 10

7 Tex. Admin. Code § 153.14(2)(B) ........................................... 10

7 Tex. Admin. Code § 153.14(2)(C) ........................................... 10

7 Tex. Admin. Code § 153.16 ..................................................... 20

### Other Authorities

Ann Graham, *Where Agencies, the Courts, and the Legislature Collide: Ten Years of Interpreting the Texas Constitutional Provisions for Home Equity Lending*, 9 Tex. Tech Admin. L.J. 69, 84 (2007) ......................................................................... 18

### Constitutional Provisions

Section 50(a)(6)(L) ............................................................ *passim*

Section 50(a)(6)(Q)(x)(c) ........................................................... 15

Section 50(a)(6)(Q)(x)(f) ........................................................... 16

# INTRODUCTION

Is Section 50's requirement of "substantially equal" payments a one-time requirement applicable only at closing, and thus waivable at any time thereafter? Section 50(a)(6)(L). Nationstar and now the Fifth Circuit U.S. Court of Appeals say it is. That conclusion requires indiscriminately lumping together capitalization events that do not alter the loan terms (a *Sims* "restructuring" of the loan principal) with true modification agreements that do change the original loan's terms. But by that logic -- in which all post-closing agreements that do not extend new credit are permissible -- other flatly-prohibited terms will also become legal at any time after closing, such as personal recourse and nonjudicial foreclosure. Section 50(a)(6) loans will effectively cease to be Section 50(a)(6) loans after closing, since any substantive term will become subject to amendment. The profound issue for this Court -- an issue of first impression in the Texas appellate courts -- is whether the cornerstone perpetual requirements of home equity loans, such as substantial payment equality, will survive.

## ADDITIONAL FACTS IN REPLY

The Fifth Circuit U.S. Court of Appeals recently held, in an unpublished *per curiam* decision, that a Texas $190,000 home equity loan that began life with a schedule of substantially-equal payments can be modified to schedule a $146,000 balloon due at maturity. *Hawkins v. JP Morgan Chase Bank, N.A.*, No. 13-50086, 2015 WL 3505353, at *2 (5th Cir. June 4, 2015), *reh'g and reh'g en banc denied* (June 30, 2015) (remanded for determination whether new money was in fact added to Ms. Brooks's loan to potentially explain such a large balloon). The Fifth Circuit also held that Texas home equity loans can be modified to schedule five years of interest-only payments followed by a large payment spike. *Id.* (dismissing Mr. Hawkins' claim with prejudice). The Fifth Circuit based its decision on an erroneous interpretation of *Sims v. Carrington Mortgage Servs., L.L.C.*, 440 S.W.3d 10 (Tex. 2014, reh'g denied), which legalized "restructurings" that capitalize past-due sums into the note. According to the Fifth Circuit, a modification of a home equity loan can include terms that otherwise violate Section 50(a)(6) so long as the modification agreement does not extend new credit to the borrower.

Also pending in federal court, an identical case against Bank of America alleges a $414,500 home equity loan that was modified to include a $280,000 balloon, and another loan that was modified to schedule interest-only for five years. *See Starkey et al. v. Bank of America, N.A.*, No. 4:12-cv-02084, Doc. 58 (S.D. Tex. Nov. 3, 2014) (3d A. Complaint) (stayed pending finality in *Hawkins*, cited above).

## ARGUMENT IN REPLY

The trial court's decision in this case and the Fifth Circuit's decision in *Hawkins* would legalize both balloons and other terms that are anathema to Section 50(a)(6) loans, like personal recourse and nonjudicial foreclosure. Appellants argued in their opening brief that some of the requirements of Section 50(a)(6) are facially perpetual for the life of a home equity loan and cannot be bargained away after closing. Brief of Appellants at 18. This reply brief offers additional points in response to Nationstar's brief and the recent Fifth Circuit decision in *Hawkins*, which Appellants believe was wrongly decided.[1]

---

[1] *Hawkins* is not controlling on this Court, and, as an unpublished *per curiam* opinion, is not even controlling in other federal cases. *See Hayes v. Bank of Am., N.A.*, No. 4:13-CV-760-A, 2014 WL 308129, at *6 n. 2 (N.D. Tex. 2014)

## I. *Sims* briefly recapitulated

Appellants' opening brief discusses *Sims* at length. Brief of Appellants at 14-16. Summarized to frame the arguments in this Reply, *Sims* legalizes the capitalization of past-due sums into a home equity note without the parties having to go through all the hoops of originating a new home equity loan. *Sims* holds that adding principal already due under the loan documents does not, in and of itself, represent new money or a change in loan terms, but is instead a mere "restructuring" of existing obligations. 440 S.W.3d. at 16.

However, the Texas Supreme Court stressed that the loan at issue in *Sims* continued, upon modification, to have substantially equal, regular payments as originally agreed when the loan was made: "Section 50(a)(6) does not forbid a revision of the initial repayment schedule that merely adjusts the regular installment amount." *Id*. No issue was presented in *Sims* of balloons, payment spikes, or other volatile payment schedules, which would constitute modifications of substantive loan repayment terms. Indeed, the Simses' restructuring actually lowered their regular monthly payment, and did so *for the entire remainder of their*

(acknowledging non-controlling nature of unpublished *per curiam* decisions of the 5th Circuit).

4

*loan's term. Id.* at *13 (table of figures shows that original payment was permanently lowered from $611 to $492 in successive rate-step increments over 2 years). The lesson: any amount of past-due sums authorized by the loan documents can be added back into the note without having to originate a new loan, but there must still be a "regular installment amount" as contemplated by the original note. Nothing in *Sims* impliedly or expressly allows the parties to substitute a new, volatile payment schedule for the substantially-equal payment schedule in the original note.

## II. *Sims* addresses solely capitalization events, not changes to the terms of the original loan.

*Sims* is a narrow holding on specific facts concerning the amount of money included in a loan's principal, and the terminology it employs to limit its holding to such situations is critical to understanding why it has nothing to do with this case.

The facts in *Sims* deal solely with a "restructuring" event that capitalizes past-due sums into the note and adjusts the "regular installment amount" accordingly. 440 S.W.3d at 16. The Simses had past-due sums capitalized into their existing note, their interest rate lowered by several percent in stages, and their monthly installment of principal and interest permanently lowered

5

by $120 until maturity. 440 S.W.3d at 12. Their original loan's substantially-equal payment scheme was not altered; nor were any other substantive changes made to the loan terms. The sole issue for decision was whether the capitalization event constituted a new extension of credit (that is, a new home equity loan). The Texas Supreme Court said No, the existing loan merely continues rolling on with the increased, reamortized principal allocated to slightly lower regular payments.

The *Sims* decision takes pains to refer to the narrow type of agreement at issue there as either a "restructuring" or else a "capitalization," avoiding use of the term "modification" since no changes were made to the terms of the loan:

> The applicability . . . of Section 50(a)(6), which governs home equity loans, depends not on whether the transaction is a modification or a refinance but on whether it is an "extension of credit". If the restructuring of a home equity loan does not involve a new extension of credit, the requirements of Section 50(a)(6) do not apply. Thus, we restate the first certified question as follows:
>
> > 1. After an initial extension of credit, if a home equity lender enters into a new agreement with the borrower that capitalizes past-due interest, fees, property taxes, or insurance premiums into the principal of the loan but neither satisfies nor replaces the original note, is the transaction *a new extension of credit* for purposes of section 50 of Article XVI of the Texas Constitution?

6

440 S.W.3d at 15; *see id.* at 17 (using "restructuring"). The *Sims* Court in fact expressly rejected use of the term "modification" to describe capitalization-type agreements because, in the Supreme Court's view, the capitalization event does not modify the terms of the loan. 440 S.W.3d at 15-16.

At the risk of repetition but to bring the point home, the narrow holding of *Sims* is that if an agreement (by whatever name) does no more than add ("capitalize") sums already due under the existing terms of the loan back into to the principal of the note, then that specific agreement or event is not a "new extension of credit." Accordingly, the post-closing restructuring agreement does not have to comply anew with *all* the myriad requirements of Section 50(a)(6), as a new extension of credit would.

By contrast with the *Sims* facts, it is emphatically true that the post-closing agreements at issue in this case contain two distinct components, a *Sims*-type capitalization/restructuring that is not a modification at all, *and also* a modification of the original notes' substantially-equal payment schedules. Despite this seemingly irrefutable fact, Nationstar consistently conflates the restructuring aspect (authorized by *Sims*) with the separate and

7

distinct change to the payment scheme (not authorized by *Sims*). Brief of Appellees at 21. Nationstar further confuses matters with a digression into a three-part test whether a "modification" is an "extension of credit." But the issue whether the restructuring aspect of Appellants' modification agreements constitute an extension of credit is irrelevant --Appellants acknowledge that the capitalization portion of their loan modification agreements is permissible. It is the separate and distinct implementation of new, volatile payment schedules that is at issue here.

A restructuring and an actual modification of a loan term can exist either side-by-side in one agreement, or else separately in unrelated agreements. In this case, Nationstar both restructured the loan to capitalize past-due payments *and also* rescheduled that restructured principal to include a teaser-period of interest-only payments followed by a payment spike meeting the definition of a balloon. *See* 7 Tex. Admin. Code § 151.1(1) (2015). However, a given post-closing agreement could do nothing more than amend the payment schedule to lower the monthly payments and schedule a large balloon to recapture the deferred amounts, or else create a multi-year period of interest-only payments followed by a payment spike. Neither is permissible at closing; the issue here is whether

such practices are permissible afterward, whether combined with a restructuring or not.

What Nationstar does, by misconstruing *Sims* to cover *all* post-closing transactions and not only capitalizations, is construct an argument that *any* post-closing agreement short of a new extension of credit is permissible no matter what it provides -- in other words, that any event that does not include new money is allowed to violate any provision in Section 50(a)(6): "Because the modifications were not new extensions of credit, none of the requirements in Section 50(a)(6)—including those in Section 50(a)(6)(L)—apply to them." Brief of Appellees at 21. The Fifth Circuit similarly conflates restructurings and substantive changes to the loan terms and makes the same mistake:

> The Hawkins and Cusick transactions each involved capitalization of past-due amounts under the loan without satisfying or replacing the original note, advancing new funds, or increasing the obligations created by the original note. Thus, *the restructurings of these loans were modifications, which do not require compliance with Section 50(a)(6).*

*Hawkins,* 2015 WL 3505353, at *2 (emphasis added). The upshot of misapplying *Sims* to cover all post-closing agreements is that all modifications become exempt from Section 50, since by definition a mere modification does not extend new credit. *See Sims; see also* 7

9

Tex. Admin. Code § 153.14(2)(B) (2008) (the advance of additional funds is not permitted by a modification).

This confused commingling of capitalizations that don't alter the loan and modifications that do is disastrous. No authority (except the new *Hawkins* decision in the Fifth Circuit) supports a broad rule allowing literally anything except new money to be included in a modification. The narrow holding in *Sims*, validating capitalizations, does not reject or even conflict with how the official regulations treat "modifications" that actually alter the terms of the loan. *See* 7 Tex. Admin. Code § 153.14. The regulations say, among other things, that a modification cannot implement "new terms" that would have been prohibited "*at the date of closing*." 7 Tex. Admin. Code § 153.14(2)(C) (emphasis added). Would a balloon note have been prohibited at closing? Plainly Yes, which is why it isn't allowed at any point later and is an impermissible "modification" of loan terms. The same holds true for modifications that permit personal recourse and nonjudicial foreclosure. Since such "new terms" were not at issue in *Sims*, *Sims* had no need to fashion a general rule concerning true modifications.

In summary, *Sims* does legalize capitalization agreements,

which do not modify the terms of the loan; but it does not legalize (or even address) agreements that do modify the terms of the loan. No conclusion can be drawn from *Sims* concerning post-closing events other than the capitalization of past-due sums, and that is true whether such events accompany a capitalization (as occurred in this case) or are the subject of a separate agreement. That said, it is supremely troublesome when a borrower facing foreclosure gives up important borrower protections of Section 50(a)(6), such as substantially-equal payments, as the price for having the lender capitalize past-due payments to bring the loan current and prevent foreclosure. There is no reason why Nationstar could not have stopped at mere capitalization, adjusting the interest rate and potentially the maturity date to achieve low payments permanently, rather than resorting to a new schedule of payments with profound payment volatility.

### III. New extensions of credit must satisfy *all* of Section 50(a)(6), but a mere modification may, separately, violate *any or all* of the particular requirements of Section 50(a)(6)

Another way Nationstar incorrectly characterizes *Sims* stems from how *Sims* permits capitalization restructurings to avoid "all" of Section 50(a)(6):

The applicability . . . of Section 50(a)(6), which governs

11

home equity loans, depends not on whether the transaction is a modification or a refinance but on whether it is an "extension of credit". If the restructuring of a home equity loan does not involve a new extension of credit, *the requirements of Section 50(a)(6) do not apply*.

440 S.W.3d at 15 (emphasis added). *Sims* only addresses whether an all-new loan must be originated -- from scratch, at a stroke, with a new closing and all the bells and whistles -- in order for past-due sums to be added to loan principal. *Id*. at 11-12 ("the restructuring . . . need not meet the constitutional requirements for a *new* loan").

*Sims* had no occasion to address whether a separate, substantive modification of a loan term violated one (and only one) specific provision of Section 50(a)(6). The Supreme Court did discuss specific subsections of Section 50, but solely in the context of the core issue whether *all* of Section 50(a)(6)(A)-(Q) is triggered. The Supreme Court discussed Section 50(a)(6)(B), the 80% loan-to-value ratio requirement, but merely to point out that it only applies "*on the date the extension of credit is made*." 440 S.W.3d at 17 (emphasis in original). Since the Simses' later capitalization restructuring was *not* an extension of new credit, it did not trigger the one-time 80% test again. That leaves open the obvious question whether requirements that apply for the life of the loan, like

Section 50(a)(6)(L), can be waived after closing. All the Supreme Court said about that subsection was that the Simses' capitalization didn't implicate it since payments remained substantially equal after the capitalization. In summary, the whole basis for the *Sims* suit was the Simses' claim that they received new loans that should have triggered *all* the required formalities; they made no claim that, apart from the capitalization restructuring, the agreements at issue changed substantive terms of the original loan. *Id.* at 11-12.

Here, by contrast, Appellants acknowledge that, since no new extension of credit occurred, no new loan was required to be originated triggering all of Section 50(a)(6) again. They challenge solely the modification of the original loan's repayment scheme, a modification that abandoned substantial payment equality in order to implement a new, volatile payment scheme. That is analytically distinct and separate from the *Sims* issue and does not invoke *all* of Section 50(a)(6), but only the clause the modification runs afoul of, Section 50(a)(6)(L).

## IV. Nationstar miscalculates the balloon

Nationstar argues there were no payment shocks or balloons, avoiding any mention of the 400%-500% payment spikes and the

necessity creating a new schedule of payments once principal was increased. Brief of Appellee at 29-30.

Section 50(a)(6)(L)'s regulations define a balloon as any payment more than twice the average of all prior "scheduled" payments. 7 Tex. Admin. Code § 151.1(1). Nationstar averages all payments back to loan origination, but that cannot be correct. As Nationstar's own evidence shows, the loans were ***restructured*** to capitalize past-due sums into the notes and ***re-amortize*** the payments according the ***new principal sums and interest rates***. CR206-207 (¶¶ 10-11, 17-18). It makes no sense to refer to the payments scheduled under the original amortization schedule because those payments were based on superseded loan figures. The relevant "scheduled" payments for Graze and Criddle can only be those set out in the post-origination modifications since those schedules contain the new, increased principal sums upon which the new payment schedules are based. Nationstar is comparing apples to oranges in order to minimize the harm it did to Appellants and avoid the regulations' technical definition of a "balloon."

In any event, whether or not the post-modification payment spikes constitute "balloons" according to the regulations, the fact

that the borrowers' payments went up by factors of over 400% in each case defeats any contention that the borrowers' payments were "substantially equal" within the meaning of Section 50(a)(6)(L).

## V. Nationstar's purported cures *are* the violations of Section 50(a)(6)(L)

Nationstar argues that certain letters it sent to the borrowers in 2012, a year before the borrowers notified Nationstar of violations, were in fact cures. Brief of Appellee at 31 (citing CR266, 321). But those weren't cures -- they are the violations complained of.

Section 50's cure process requires a borrower to notify the lender, at which time the lender has 60 days to cure the illegality. Section 50(a)(6)(Q)(x). A Section 50 cure requires that the lender

> [send] the owner a written notice modifying any other amount, percentage, term, or other provision prohibited by this section to a permitted amount, percentage, term, or other provision and adjusting the account of the borrower to ensure that the borrower is not required to pay more than an amount permitted by this section and is not subject to any other term or provision prohibited by this section.

Section 50(a)(6)(Q)(x)(c). In the alternative, if a cure isn't possible under subsection (c) above, the lender must credit the borrower $1,000 and

[offer] the owner the right to refinance the extension of credit with the lender or holder for the remaining term of the loan at no cost to the owner on the same terms, including interest, as the original extension of credit with any modifications necessary to comply with this section or on terms on which the owner and the lender or holder otherwise agree that comply with this section.

Section 50(a)(6)(Q)(x)(f). Failure to cure according to this process results in forfeiture. *Id.*

Graze's evidence shows that he notified Nationstar of illegality on February 19, 2013. CR347. Any cure was due April 19, 2013. Nationstar took no action to cure thereafter. CR340. Criddle's evidence establishes that she sent notices of illegality on January 28, 2013, and April 23, 2013. CR356, 358. Nationstar never responded. CR354, 360. Nationstar in fact believed that the modifications violated Section 50 in the ways the borrowers identified, and told Graze and other borrowers as much; yet Nationstar still refused to cure and began foreclosure proceedings. CR349, 351, 363-366 (admissions); CR 343, 349, 372 (foreclosure notices).

Inspection of the letters to Graze and Criddle reveals that they are not cures contemplated by the process set out in Section 50, but instead ordinary lender notifications to Graze and Criddle that the borrowers are about to get hit with balloon payments

16

owing to the conclusion of the interest-only payment periods. As a matter of law, these do not constitute cures. They do not comply the cure process contemplated by Section 50 and evidence no agreement or implementation of any cures. And they do not, in fact, cure the illegality of the modifications -- they affirmatively *implement* it. These letters, far from showing any cure, constitute the proof that Plaintiffs' loans violate the "substantially equal" requirement.

## VI. The independent requirement that payments pay all interest coming due doesn't doesn't provide a safe-harbor for payments composed solely of interest

Nationstar argues that since Appellants' interest-only payments paid all interest coming due every period, the altered payment schedules fully comply with Section 50(a)(6)(L). Brief of Appellee at 25-26. But paying all interest due each period is not the *sole* criterion for legality under Section 50(a)(6)(L). If that were the case, then balloons composed of principal deferred for 30 years would be legal. Meeting the independent requirement that payments pay all current interest cannot exempt an otherwise volatile payment schedule from the other requirements.

As argued in Appellants' opening brief, interest-only payments do not meet the first discrete requirement of Section

17

50(a)(6)(L), that the loan be "repaid." Brief of Appellants at 23. Payments without a principal component do not, by definition, "repay" the original loan amount. In addition, interest-only schedules generate substantial inequality and balloons, as demonstrated with the Graze and Criddle modifications, where payments went up by four-fold and five-fold at the end of the interest-only periods.

What the requirement that all interest coming due must be paid with each installment addresses is a specific problem not implicated in this case: negative amortization. That occurs when accrued but unpaid interest builds up. As explained in the *Graham* article:

> Interest that has accrued but has not been paid is added to the original amount owed, with the result being the borrower owes more principal each month, despite making payments. Negative amortization is expressly prohibited for Texas home equity loans.

Ann Graham, *Where Agencies, the Courts, and the Legislature Collide: Ten Years of Interpreting the Texas Constitutional Provisions for Home Equity Lending*, 9 Tex. Tech Admin. L.J. 69, 84-85 (2007).

### VII. "Temporary" = Volatile = Bad

Nationstar repeatedly characterizes the interest-only period of Appellants' loan modifications as "temporary," as though that

were a good thing. By that test, "temporary" interest-only periods at the outset of a loan would be good too, since a 2% teaser rate would permit borrowers who could not otherwise afford a home equity loan to get one – at least initially. But teaser periods are Constitutionally bad. They create surprise payment obligations later. And they are as bad at the middle of the loan as they are at the beginning or the end. What the requirement of "substantially equal" prohibits is, precisely, payment volatility. "Temporary" 2-year periods where the bottom drops out entirely, as illustrated in Nationstar's graphs (Brief of Appellee at 12-13) do not help the borrower because they exemplify the volatility that Section 50(a)(6)(L) seeks to prevent.

While payments that pay no interest are an independent violation of Section 50(a)(6)(L) as argued in Appellants' opening brief, the volatility metric looks only at dollar amount variability. That metric is not dependent on whether principal is included with every payment, but instead on the delta in the payment amount from month to month, or year to year. That is why, in the case of variable-rate home equity loans, the regulations permit only gradual interest-rate steps so that payments will remain "substantially equal between each interest rate adjustment." 7

Tex. Admin. Code § 153.16. Preventing huge interest-rate swings is one important reason Section 50(a)(6)(L) exists.

The bottom fell out of Appellants' monthly payments for two years in this case, which was good only while it lasted. The interest rate was slashed to 2%, a fraction of the notes' respective rates, but after two years it would abruptly jump back up to the original rate, multiples higher. That is textbook substantial inequality, since there are no tiers or baby-steps as a variable-rate loan -- which in essence is what these loans became -- would require. These huge swings would be as bad month to month as they would be year to year because they whipsaw the borrower in either case, belying Nationstar's assertion that Section 50(a)(6)(L) favors "temporary" volatility as a foreclosure prevention tool.

Finally, nothing in Section 50(a)(6) defines "temporary" for purposes of allowing a holiday from substantially-equal payment schedules. This Court would have to legislate that. While Appellants' fractional-payment periods were two years, other cases in the MDL were both shorter and longer. In the recent *Hawkins* case in the Fifth Circuit, the period was five years. 2013 WL 3505353, at *1. It is difficult to see how to settle on any given allowable period, since short periods done sporadically can

20

generate volatility just as one long period followed by a balloon can. The test for volatility is not the duration of the payment steps, but their magnitude. Had Nationstar scheduled Appellants' payments to rise in 1% increments annually following the rate plummet to 2%, that would have avoided creating the brick wall following the "temporary" period of reduced payments.

## CONCLUSION

The most important thing for the Court to take from *Sims* is that it does not address modifications of the original loan's terms. In fact, *Sims* took pains to distinguish capitalizations (restructurings) from all other kinds of post-closing agreements. And the facts of *Sims* gave the Supreme Court no occasion to address changes to the original loan's terms. The Simses, unlike Appellants here, continued to have substantially equal payments after their modifications because their agreements did not change the repayment terms of their original loan but merely adjusted it slightly downward permanently. Nationstar and the Fifth Circuit U.S. Court of Appeals both miss that point. While the capitalization events within Appellants' "loan modification agreements" were valid and did not trigger anew a Section 50(a)(6) lending moment (with all the bells and whistles), the separate and

21

distinct change to the repayment scheme implicated Section 50(a)(6)(L) because it affirmatively *abandoned* "substantially equal" payments. Section 50(a)(6)(L) abhors volatile repayment schemes throughout the life of the loan. Otherwise, it would be an all-but meaningless one-time requirement at closing, easily abandoned by modification the day after.

Respectfully submitted,
**/s/ JPS**
J. Patrick Sutton
Texas Bar No. 24058143
1706 W. 10th Street
Austin Texas 78703
Tel. (512) 417-5903/Fax. (512) 355-4155
*jpatricksutton@ jpatricksuttonlaw.com*


Jeffrey W. Hurt, Esq.
Texas Bar No. 10317055
10670 N. Central Expy Ste 450
Dallas, Texas 75231
Tel: (214) 382-5656/Fax: (214) 382-5657
*jwhurt@hurtberry.com*

Attorneys for Appellants

**CERTIFICATE OF SERVICE**

I certify that on July 13, 2015, per T.R.A.P. 6.3(b), a true and correct copy of this brief was served by efiling and email on:

Thomas G. Yoxall
Daron Janis
Locke Lord LLP
2200 Ross Avenue Suite 2200
Dallas TX 75201
*tyoxall@lockelord.com*
*djanis@lockelord.com*

B. David L. Foster
Locke Lord LLP
600 Congress Avenue, Suite 2200
Austin, Texas 78701
*dfoster@lockelord.com*


/s/ *J. Patrick Sutton*
Attorney for Plaintiffs-Appellants

**CERTIFICATE OF COMPLIANCE**

This document complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in Century Schoolbook 14-point for text and 12-point for footnotes. Spacing is expanded by .6 point for clarity. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i)(2) because it contains **4317** words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1), and Appellants' briefs do not in the aggregate exceed 27,000 words.

/s/ *J. Patrick Sutton*
Attorney for Appellants